# JIM JEANETTE v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY.[1]

August 6, 1915.

Nos. 19,350—(233).

**Injury to trespasser — proximate cause of injury.**

Decedent, a boy nine years of age, received injuries resulting in death while stealing a ride upon one of defendant's freight trains. Defendant had failed to fence its right of way as required by statute. *Held*, that defendant's failure to fence, under the circumstances shown by the evidence, was not the proximate cause of the injury.

[1] Reported in 153 N. W. 1086.

---

Note—As to duty of railroad company to fence tracks against children see notes in 25 L.R.A. 784, 16 L.R.A.(N.S.) 1103.

As to right to judgment *non obstante veredicto* because of failure of proof see note in 12 L.R.A.(N.S.) 1021.

130 M.—33.

Action in the district court for St. Louis county by the administrator of the estate of Pasquale Jeanette, deceased, to recover $3,000 for the death of his intestate. The case was tried before Ensign, J., who, when plaintiff rested, denied defendant's motion to dismiss the action and a jury which returned a verdict in favor of plaintiff. Defendant's motion for judgment notwithstanding the verdict was denied. From the judgment entered pursuant to the verdict, defendant appealed. Reversed.

*John L. Erdall* and *Fryberger, Fulton & Spear,* for appellant.
*John Jenswold* and *C. R. Magney,* for respondent.

SCHALLER, J.

Plaintiff is the administrator of the estate of Pasquale Jeanette. The decedent, a child of the age of nine years, lost his life in an accident which happened on the twenty-third day of September, 1913. Plaintiff brought an action against the defendant, alleging negligence. The answer denied the negligence and alleged contributory negligence on the part of the parents and on the part of decedent. The case was tried to a jury which returned a verdict for plaintiff. Defendant moved for judgment notwithstanding the verdict. The motion was denied and judgment was entered, from which judgment defendant appeals.

The accident in which decedent received the injuries resulting in his death occurred on the right of way of defendant in the city of Duluth, at a point south of Michigan street near Twelfth avenue west in said city. There are three railroad tracks running east and west near this point and approximately parallel with Michigan street. The one immediately south of Michigan street is the track of defendant. Immediately south of defendant's right of way is the Great Northern Railway Company's right of way with a track upon it, and immediately south of that is the right of way of the Northern Pacific Railway Company. Standing on Michigan street and facing to the north is a building called in the record the "Salvation Army building," the rear of the building being toward the defendant's track. Between the Great Northern track and the Northern Pacific track are two houses, both occupied by families. These houses are

situate about 20 feet north of the Northern Pacific tracks.  Back of the houses and toward the west is a small garden.  A small creek crosses the right of way of defendant, thence flows southerly under the Great Northern track, which at this place is on trestle work; the stream flows near the houses between the Great Northern and the Northern Pacific tracks, then turns and runs westerly parallel with the Northern Pacific track.  It is crossed by defendant's track on a bridge or trestle and by the Great Northern on a trestle.

Defendant's line, running east and west and parallel with Michigan street, is lower than the street, the distance being about 30 feet. The embankment is a rock embankment, on top of which a fence extends along the defendant's northerly right-of-way line.  On the north side of the right of way a ladderway leads from the level of the street to the level of defendant's track.  It had been there for a long time and was used by workmen for climbing up and down from the right of way to the street.  It consisted of two ladders, one about 10 feet long, reaching up to a ledge of rock, and a longer one extending from the ledge of rock up to the street level.  The place where the accident occurred was at or near the little bridge on which defendant's track crosses the little stream, above spoken of.  Near this point there is a comparatively level stretch extending from the foot of the ledge of rock southerly.  This level tract is between 100 and 150 feet long east and west.  There is but one track on the defendant's right of way at the point where the little bridge crosses the creek.  In both directions from this point the track runs through rock cuts and into a tunnel on the east.

It appears that on the morning of September 23, decedent and a boy friend of about the same age, named Henry Johnson, were in the so-called Salvation Army building, looking at a bicycle which was for sale.  They went to the rear windows of the building and, looking out, saw another boy, Jimmy Davitis, playing near his home which was one of the two houses on the Northern Pacific right of way.  They decided to go down to play with Jimmy.

They then went over, under or through the fence on the Michigan street side, climbed down the ladders leading to the foot of the rock bank, crossed defendant's track, the Great Northern right of way,

and joined Jimmy on the Northern Pacific right of way. Jimmy was playing near a fire at a little camp or shack which the boys had constructed on the Northern Pacific right of way near Jimmy's home. The other house was occupied by a family named Breole.

After they had been playing for some time, and about noon, one of the boys, seeing one of defendant's engines with a string of freight cars coming eastward along its track, called out "Here comes a ride," or "Here comes a Soo Line train; let's jump on." The boys ran toward the train, crossed the little stream, crossed the Great Northern right of way, passing under the trestle and crossed defendant's right of way to the point where the train was. Decedent jumped onto the moving train, catching hold of the ladder of a box car toward the front end. The train was going slowly and just about coming to a stop. It stopped and began to back. Decedent tried to get off and was injured. His legs were crushed under the trucks. He fell off at the little bridge and into the creek. Both legs were fractured and he died four days later. It appears from the evidence that decedent just before he fell was hanging on the brakemen's ladder at the side of the car, resting his feet on the lowest rung or step. In trying to get off he put one foot or both feet on the journal box (called by the witness "grease box.") His foot slipped on the journal box and he lost his hold, slipping under the wheels. The train at the time seems to have been moving quite slowly, backing down toward a switch which was some distance to the west. None of the train crew saw the boys at any time, nor did they know of their presence or of the accident until some time afterward.

It appears that neither decedent nor Johnson had attended school that morning. It also appears that decedent and another boy had been playing on cars on the Northern Pacific right of way the day before. They had been warned away by Joe Breole, who told them that they would get hurt if they played around the cars. Breole chased decedent across the defendant's right of way and watched him until he had gone up the rock bank and onto Michigan street.

The evidence is convincing that decedent was an average boy, well grown for his age and of average intelligence, that he attended school, occasionally played truant, but stood in his classes at about the point

usually attained by boys of his age, and that in all other respects, physically and mentally, he had attained the stature and development of the normal boy. His age on the day of the accident was nine years and nine days.

The premises in question at the point where the accident happened were not station or depot grounds, nor does it appear that the necessary business of the railroad company or public convenience required the defendant to leave the right of way unfenced at this point. There was no fence between the defendant's right of way and the Great Northern right of way; neither was there a fence between the Great Northern right of way and the Northern Pacific right of way. The rights of way of none of these companies have ever been fenced at this point so far as the record discloses.

One of the grounds of negligence charged in the complaint was that the railroad of the defendant was, with its approval, knowledge and consent, used by a large number of people to cross and walk along the track and by children to play upon, and that children, with its knowledge and consent, played with and on its moving cars and trains and were carried thereon and that the said custom continued until after said injury, to such an extent that defendant should reasonably have apprehended that such children would be there and exposed to danger from its operation of cars and trains during any and all hours of the day. It is further alleged that defendant, up to the time of the injury, negligently, carelessly and contrary to the statute, failed and omitted to build and maintain a good and substantial fence on each side of its railroad and failed to maintain any fence whatever on either side of the railroad at, or in the vicinity of the place, but left the railroad uninclosed and open to the public.

The first ground of negligence appears not to have been pressed on the trial. Plaintiff bases his right of recovery upon the negligence of the defendant in failing to provide a fence along its right of way as required by statute.

The question in this case is whether the failure to fence was, as a matter of law, the proximate cause of the injury. If, on the conceded facts, it was not, the judgment should be reversed.

1. Section 4263, G. S. 1913, provides:

"Every such company shall build and maintain on each side of all lines of road owned and operated by it, good and substantial fences, and shall build and maintain good and sufficient cattle guards at all road and street crossings and other openings, except at station and depot grounds, and other places which the necessary business of the road or public convenience requires to be open."

What constitutes a statutory fence is provided in section 6017, G. S. 1913.

It has been decided that it is a sufficient compliance with section 4263, G. S. 1913, if the railway company builds and maintains such fence as is described in section 6017, G. S. 1913. Ellington v. Great Northern Ry. Co. 96 Minn. 176, 104 N. W. 827.

The question presents itself whether a statutory fence would probably have prevented this boy from entering upon defendant's right of way.

In view of the kind of fence which the statute requires, the age of the boy, his powers of discretion, his normal development and his natural disposition must enter into the consideration of the question. We cannot apply to a child of his age and mental development the rules which are applied to children of such rudimentary intelligence as would justify the statement that they were without judgment or discretion whatsoever. This child seems to have been normally intelligent and well developed. He apparently had the discretion and judgment usually expected of the average boy of his age, and the common boyish inclination to do what other boys did, and to follow the lead of other boys in boyish fun and enterprises.

He unhesitatingly followed his companion, Henry Johnson, across or through the fence on the north side of defendant's right of way. He followed him down the ladder, and over to the Northern Pacific right of way, where Jimmy Davitis had the shack. When one of the boys called out "Here comes a ride," he with the others ran from the shack to the cars. He got on the car and rode on it. He had no purpose in going on the defendant's right of way other than to get a ride. Under the circumstances disclosed by the evidence, a statutory fence would not have been an obstacle to his progress or a

deterrent from his purpose. He was going to get a ride on these cars with the other boys and would have gone over, under or through any statutory fence to get that ride, if the others went, for the reason, if none other, that the other boys should see that he was not afraid to go where they went or to do what they were doing. The laws of boydom required this and he unhesitatingly complied.

2. Was defendant's failure to fence the proximate cause of the injury? The question of proximate cause is nearly always a question for the jury under proper instructions. The learned trial court submitted this with the other issues to the jury in a charge, full, complete and thoroughly comprehensive, remarkable for its clear statement and studied brevity. The jury by its verdict answered the question in the affirmative. The sequence of events, so far as applicable here, seems to be that these children, while at play, saw a train of freight cars moving on defendant's right of way, that it occurred to them that they could steal a ride on the cars and that one of them called out "Here comes a ride," or "Here comes a Soo Line train; let's jump on," whereupon they ran toward defendant's right of way. They crossed the little stream, ran across the Great Northern right of way, got upon defendant's right of way, ran up to the track, and decedent jumped on one of the cars as they were moving forward. The cars stopped and began to back. As they were backing, decedent attempted to get down from the car upon which he was riding and in some way placed his feet upon the journal box, slipped and fell under the train. None of his companions were injured.

"The negligence of the defendant spent its force when the boy entered upon the tracks, and, unless the defendant is liable for every injury which might possibly occur to one who enters the premises because of the absence of the fence, it is not liable in this case." Paquin v. Wisconsin Central Ry. Co. 99 Minn. 170, 108 N. W. 882.

It does not appear that defendant's servants were negligent, or that in handling the train they failed in any duty which they owed to decedent or to the public. It is conceded that the trainmen knew nothing of the presence of these boys on the right of way or on the

cars. Decedent was not injured on account of any negligence of the train crew in starting or stopping the cars, because during the time this was being done he was safely ensconced on the ladder with his foot on the bottom rung. We must, therefore, hold that, under the circumstances of this case, as shown by the record, the failure to fence was not the proximate cause of the injury. We cannot hold otherwise without entirely disregarding the decisions of this court in the cases of Fezler v. Willmar & S. F. Ry. Co. 85 Minn. 252, 88 N. W. 746; Paquin v. Wisconsin Central Ry. Co. 99 Minn. 170, 108 N. W. 882, and Mehalek v. Minneapolis, St. P. & S. S. M. Ry. Co. 105 Minn. 128, 117 N. W. 250.

One of the cases which respondent earnestly urges as decisive herein is the case of Heiting v. Chicago, R. I. &. P. Ry. Co. 252 Ill. 466, 96 N. E. 842. That case, however, arises out of a state of facts different from those in the case at bar. In Heiting v. Chicago, R. I. & P. Ry. Co. the case of Fezler v. Willmar & S. F. Ry. Co. supra, was strongly relied upon as controlling. The court, however, justly remarks that "No two causes are precisely alike." In that case the boy did not attempt to touch or board a moving train. The ordinance of the city of Chicago there under consideration was held to be "clearly intended in many of its provisions for the protection of persons against injury from the operation of railroads in the city."

Judgment reversed.