STEVEN MICHAEL HOCKING, A MINOR, BY CORINNE
HOCKING, HIS MOTHER AND NATURAL GUARDIAN,
AND ANOTHER v. DULUTH, MISSABE & IRON
RANGE RAILWAY COMPANY.

117 N. W. (2d) 304.

September 14, 1962—No. 38,301.

*Franklin B. Stevens* and *John F. McGrath,* for appellant.
*Lewis, Hammer, Heaney, Weyl & Halverson,* for respondents.

NELSON, JUSTICE.

This appeal involves an action for personal injuries sustained by Steven Michael Hocking, a minor, brought against the Duluth, Missabe & Iron Range Railway Company in said minor's behalf by his mother and natural guardian, and said action includes a separate claim by Corinne Hocking, the mother, for medical, hospital, and other expenses incurred by her. The injuries to said minor resulted

from a fall while climbing about a trestle leading to one of the ore docks of defendant railway company in the city of Duluth.

The case was tried to a jury. At the close of plaintiff's evidence, and again at the close of all the evidence, the trial court denied a motion by the railway company for a directed verdict. The jury returned a verdict in favor of Steven in the sum of $10,000 and in favor of his mother in the sum of $3,324.72. The railway company moved for judgments in its favor notwithstanding the verdicts, which motion was denied. Defendant made no motions for a new trial. Defendant appeals from the judgments.

The trial court submitted both cases to the jury on the theory of negligence and left it for the jury to determine whether the railway company was negligent and whether Steven was contributorily negligent.

Upon the motion for directed verdicts below, plaintiffs were entitled to have the evidence viewed in the light most favorable to them.

The relevant facts, many of which are not in dispute, may be stated as follows: Steven, 10½ years of age, and a companion, age 12, went upon the railway company's property to capture pigeons for sale to a restaurant. The property and tracks involved are located in West Duluth, Minnesota, near West Third Street or Grand Avenue. The property consists of three large trestles which run down from that street to the edge of St. Louis Bay. These trestles were built between the years 1913 and 1918 and are used to load iron ore hauled from the mines on the iron range to the boats in the bay. The trestles abut against the hill which runs along the northern edge of the city of Duluth and they are raised above the level of the ground which descends to the bay so as to maintain a level deck and tracks above the water. Trains proceed on the tracks over these trestles en route from the iron range to the bay and constitute a part of defendant's railroad system. Two of the three trestles form the approach to the docks from which iron ore is discharged from the trains into vessels that carry it to the lower lake ports. The top or deck part of the trestles rests upon a network of upright steel columns which support two large I-beam girders which form the framework or structural portion of the deck containing the tracks over which the trains pass. The

height of these columns from the beginning of the trestles to the underneath portion of the I-beam girders varies with the grading of the ground as it slopes from the hillside to the bay shore.

On the afternoon of the accident Steven and his companion climbed up a dirt embankment at a point where the trestles meet the side of the hill and the fence terminates. Without apparent difficulty they crossed the tracks of the so-called passenger dock and climbed up inside the I-beam girder framework under the deck portion of the first ore dock, which is the center of the three docks. They did not walk along the top of the trestles or the tracks but made their way through the framework underneath. The framework through which the boys climbed consists of two very large I-beam girders spaced far enough apart to permit the laying of the railroad track on the top plus a space on each side of the tracks. The upper portion between these two beams is solidly connected with a steel and concrete decking on which the tracks are laid. The bottom portion where these large beams meet the supporting upright columns is open except that the I-beam girders are braced apart by an interlacing of steel angle irons in the form of X's as shown in the illustration.

It was along the edge of the bottom of the I-beam girders, and by use of portions of the X bracing for additional footing, that the boys worked their way for a distance of 3½ city blocks to the place where the accident occurred, at which time they were about 53 feet above the ground. There were points as they moved along where they had to get around uprights which blocked progress along the edge of the I-beam girders, at which times they would be hanging in midair. The bottom ledge of the I-beam girder has an uneven surface caused by raised rivet heads interspersed along it and it is only 7 inches wide. The angle irons that make up the X bracing are only 4 inches wide. They are placed on end leaving only a narrow edge available for footing and these are connected with the I-beam girders only at the corners of each section. At all other points there is nothing but open space between the girder ledge and the X bracing, the opening in some of these places being about 3 feet wide. The space between the I-beams is 67 inches and the X's meet in the center.

Steven testified that during the time he was working his way along the trestle framework he thought about holding on but didn't remember how the accident happened. Steven's companion, Ralph Anderson, testified that a train had passed over the trestle sometime before the accident occurred but that none was passing when Steven fell. The record does not indicate anything specific causing Steven to fall. The last thing he remembers before he fell was stopping to rest.

Steven's companion testified that he was aware of a "No Trespassing" sign and also that he knew it meant to keep out although he could not remember any specific instance when he had been told to stay out of the dock area.

Steven testified that access to the docks could be gained in various ways in spite of the cyclone fence that enclosed the area. There was other evidence which also established that the fence was not boy-proof and that there were several places where access could be gained by boys who wanted to and did circumvent the fence. There is testimony to the effect that Steven had climbed into these trestles on two earlier occasions and that on one of those occasions he climbed from the ground up to the under part of the deck of the passenger dock by means of some crosspieces on one of the upright support columns. On the occasion of his falling he said he was resting but that while he was up there he was holding on good and tight and that was the main thing he was thinking about. Steven admitted that as he climbed up there on the day of the accident he found himself hanging out in the air part of the time and on those occasions he realized if he made a misstep he would fall and get hurt. He admitted that he knew the fence around the area meant to stay out and that he shouldn't have been there; that he realized it was dangerous to be climbing on the trestles. He said he had been warned to stay away from railroad tracks but not specifically trestles but that he knew the trestle was more dangerous than the tracks themselves. He said his mother had also warned him to stay off the tracks and the record shows that all the young boys called as witnesses by plaintiffs admitted knowing that they should not be up there in the trestles, that it was dangerous; and that they might fall and be injured.

From the testimony of Steven's mother, from his own testimony, and from the school records introduced it is clear that he was a good student and did not lack the intelligence of a boy of his age.

The evidence indicates that the railway company knew and had known that children trespassed in the area. Several witnesses, including Steven's companion, were called to testify by plaintiffs and all to a greater or lesser degree admitted that they had frequented the area and had gone in among the trestles to hunt pigeons. There was testimony indicating this practice dated back at least to the early 1930's.

· A witness testifying for the railway company stated that they had hired exterminators to kill the pigeons inhabiting the trestle and dock areas. They had found it necessary to do so because of the corrosive effect pigeon excrement had on the metal in the trestle structures. This witness also testified that it would not be practical from the standpoint of either expediency or economy to attempt to make the area safer by guarding or by further fencing the trestles and railway structures or the ore docks to prevent trespassing and the type of occurrences here involved.

There was testimony by railway company witnesses that on occasions they had even gone to the Bethany Children's Home, a home for young boys in the vicinity of the railway company's tracks, to talk to them and warn them about the dangers. This precautionary measure taken on the part of the railway company was brought about because of boys going into the area to catch pigeons.

The record further indicates that the railway company patrol supervisors checked this area, and whenever young boys would be caught trespassing on railway property or trestles, they would talk to the boys about the dangers involved and in some instances apply additional caution by taking the boys home to their parents.

The record is without evidence that any part of the trestle structure gave way or was defective in any manner. The structural framework contained nothing hidden; the danger was apparent to anyone attempting to use it. Steven's fall was not caused by any concealed defects but by the acts of Steven himself in the manner in which he used the trestle for his own purposes.

The railway company alleges specifically that the following errors occurred at the trial:

"1. The trial court erred in submitting the question of defendant's negligence to the jury.

"2. The trial court erred in not holding plaintiff Steven Michael Hocking guilty of contributory negligence as a matter of law.

"3. The trial court erred in failing to direct a verdict in favor of defendant and in failing to grant judgment for the defendant notwithstanding the verdicts for the plaintiffs."

It is agreed as stated in briefs of counsel and in their oral arguments that the controlling law is that which has been followed by this court since the attractive nuisance doctrine was discarded in this state in Gimmestad v. Rose Brothers Co. Inc. 194 Minn. 531, 261 N. W. 194, and this court adopted Restatement, Torts, § 339, which reads:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

We said in the Gimmestad case that it should be clear that the phrase "attractive nuisance" indicates no special departure or exception from the ordinary run of negligence cases; that it is but a convenient phrase to designate one sort of case within the ordinary rule that one is liable for injury resulting to another from failure to exercise, for the protection of the injured children, the degree of care commensurate

with and therefore demanded by the circumstances. We concluded that the idea of invitation, express or implied, actual or factual, as a condition precedent to liability in the case of the young child injured, should be finally and emphatically discarded; that they are trespassers but, because of their tender years and the consequent lack of perception and responsibility, liability results notwithstanding the trespass. It has become well settled in this state since the Gimmestad decision that to recover in such a case a plaintiff has the burden of proving the existence of all four conditions stated by the Restatement. Meagher v. Hirt, 232 Minn. 336, 45 N. W. (2d) 563; Doren v. Northwestern Baptist Hospital Assn. 240 Minn. 181, 60 N. W. (2d) 361; Johnson v. Clement F. Sculley Const. Co. 255 Minn. 41, 95 N. W. (2d) 409. Whenever there has been a failure to meet these four conditions we have denied recovery. Meagher v. Hirt, *supra.* Since holding in the Gimmestad case that a child does not have to be enticed to the locus in quo by the instrumentality that causes injury, we have consistently refused to follow any archaic distinctions in applying the Restatement rule. We think this results in a more equitable division of community interests and adopts a standard by which this court can measure and determine the extent of the landowner's liability. Since particular facts more determinative than others constantly vary predictions as to liability generally, the most that can be done in good conscience by this court is to lay down a rule of law that in good judgment and common sense will aid in determining what fact situation comes within the presently adopted rule. We think this has been accomplished at least to a reasonable degree in following the Restatement.[1]

The rule is well settled that when defendant rests upon its motion for judgment without asking for a new trial, errors at the trial, whether in the rulings of the court or in the instructions to the jury, cannot be reviewed or considered. The only question for consideration here

---

[1]Slinker v. Wallner, 258 Minn. 243, 103 N. W. (2d) 377. That the Supreme Court of Minnesota has discarded the attractive nuisance doctrine and adopted the rule set forth in the Restatement has been fully recognized by the U. S. Court of Appeals in E. I. Du Pont De Nemours & Co. v. Edgerton (8 Cir.) 231 F. (2d) 430.

is whether it clearly appears from the record that plaintiffs are not entitled to recover.

The question here is one of negligence. The determination of whether negligence exists must depend upon whether the particular circumstances give rise to a duty which has not been performed by defendant railway company. The record indicates that the only basis for liability submitted to the jury was failure on the part of defendant railway company to use reasonable care in view of the circumstances. The question, therefore, is whether the facts of the instant case justify a finding of actionable negligence.

The trial court decided that the question was one for the jury. Defendant railway company contends that the trial court should not have submitted the question to the jury but should have directed verdicts in favor of defendant. Defendant argues that the cases which are urged in support of plaintiffs' position are not controlling because of factual differences. It contends that these factual differences are to be found in the circumstances that the railway company structures here involved are inert, stand dormant, and involve no dangerous machinery left in an open place on its right-of-way. The question thus arises whether liability follows under the Restatement rule in every case where a child falls while climbing or attempting to climb a highway or railroad bridge, a viaduct, a trestle, an ore dock, a building free from traps and concealed dangers, a fence, or an apple tree.

It has never been the rule that a railway company is required to make its land, rights-of-way, tracks, and trestles a safe playground for children. It has the same right to maintain and use its property for railway purposes as any landowner has to use his property for legal purposes. The railway company is not an insurer of the lives or limbs of children who may stray or play upon its premises.

The railway company's contention that no liability attaches to it under the facts and circumstances of this case finds support in the decisions of this state and elsewhere.

An early case in Minnesota concerning children injured by dangerous instrumentalities limited liability to a sound basis which is followed in this state today and cited by many leading cases in this country. The

rule was stated by this court in Kayser v. Lindell, 73 Minn. 123, 75 N. W. 1038, where the 3½-year-old child of a tenant fell off a retaining wall in the rear of the yard maintained by the landlord for the common use of tenants. The retaining wall extended 1 foot above the level of the yard and dropped off 7½ feet into the alley beyond. This court, denying recovery despite the child's youth, said (73 Minn. 126, 75 N. W. 1039):

"* * * The wall was plain to be seen. The child knew it was there, and fell off of it in the daytime. While the owner of premises may owe more duty to a child than to an adult coming upon his premises by implied invitation, yet he is not bound to guard every stairway, cellarway, retaining wall, shed, tree and open window on his premises, so that a child cannot climb to a precipitous place and fall off."

The Kayser case is authority for the rule that possessors of land are not liable for injuries to children who have overcome obstacles and placed themselves in a place of danger. While the Kayser case was decided in 1898 it is still the law of this state and it was recently cited with approval of this court in Slinker v. Wallner, 258 Minn. 243, 103 N. W. (2d) 377. See, also, Ewing v. George Benz & Sons, 224 Minn. 508, 28 N. W. (2d) 733; Callahan v. Buttrey (D. Mont.) 186 F. Supp. 715; and McHugh v. Reading Co. 346 Pa. 266, 30 A. (2d) 122, 145 A. L. R. 319.[2]

In Coon v. Kentucky & Indiana T. R. Co. 163 Ky. 223, 175 S. W. 325, L. R. A. 1915D, 160, defendant railway company with the consent of the city of Louisville, built a viaduct extending across one of the streets of that city. The north side of the viaduct consisted of a concrete retaining wall. The wall was about 20 inches wide with a smooth surface on top, and the west end was about 28 inches above the street. From the west end the wall gradually ascended until it reached a height of 15 feet from the street. The children in the neigh-

---

[2]The foregoing rule was established in this state before the attractive nuisance doctrine was discarded and the Restatement rule adopted. It has been adhered to under both doctrines. This attitude has been followed in other jurisdictions as shown by the many authoritative decisions reviewed and cited herein.

borhood found the wall attractive for the purpose of climbing upon it. *This fact was known to the defendant.* Plaintiff, a minor, 14 years of age, climbed the wall, and when he reached the top of it, fell and was severely injured. It was alleged that his injuries were due to the gross carelessness and negligence of the defendant railway company in failing to guard and protect the wall in such a way as to prevent injuries to children. Plaintiff based his right to recovery on the turntable cases or the attractive nuisance doctrine. The Kentucky Court of Appeals said that the wall was placed where the defendant had the right to place it and that the only ground, therefore, for holding the defendant liable would be that it maintained in a public place, in an unguarded and unprotected condition, a dangerous instrumentality or thing that was attractive to children. The court held that it could hardly be said that a retaining wall like the one in question was dangerous, or that it could be likened to a stack of lumber composed of separate pieces that are liable to fall at any time; that on the occasion of the accident it did not fall or break and, therefore, the only sense in which it could be said to be dangerous would be that it was easy to climb and easy to fall from; but, for that matter, said the court, so is every tree, every pole, every fence, every ladder, every railing or set of steps that an owner may have about his premises. Plaintiff had contended in that case that defendant railway company was negligent in not constructing the protecting wall in such a way that it could not be climbed. It was suggested that spikes could have been placed on it or that a fence or a guardrail might have been constructed at the lower point of the wall. The court said if the spikes had been placed on it and the plaintiff injured there would have been greater reason for holding defendant liable and, while a guardrail would have rendered access to the wall a little more difficult, the court was of the opinion that the natural result would have been to increase the number of climbers and not only add to their danger by furnishing them something else to fall from, but to impose upon the defendant the further duty of also guarding and protecting the additional rail or fence.

In Goven v. Sidney Winer Co. (Ky.) 342 S. W. (2d) 706, plain-

tiff, a 9-year-old boy, lost two fingers when a concrete block column he was climbing (part of a garage under construction) collapsed with him. A suit was brought against the contractors in charge of the project. After verdict was directed for defendants, plaintiff appealed. Defendants relied upon the Coon case. In reversing the trial court, the Kentucky Court of Appeals said (342 S. W. [2d] 710):

"In the case before us it is clear that the concrete block column with bolts conveniently protruding from it was an attractive object to small boys. Otherwise it would not have attracted 9 year old Ronnie Goben. It was dangerous, else it would not have fallen. To children especially, with their inexperience and immaturity of judgment, we cannot avoid the conclusions that the danger was concealed. *Had the boy merely fallen or jumped from the pier the principle of the cases cited by appellees would apply.* But the 'unexpected development' occurred * * *. The column itself broke up and fell." (Italics supplied.)

The court was of the opinion that a jury might well have determined (a) that danger of its falling from its use by children was foreseeable, and (b) that security measures available to defendants would not have been so burdensome as to be out of proportion to the risk involved.

In McHugh v. Reading Co. *supra,* plaintiffs brought an action in trespass for the death of their minor daughter. A bridge in that case carried the trains of the defendant railway over one of the avenues in the city of Philadelphia. The bridge was supported at each corner of its intersection with the street by a concrete abutment. The southeasterly abutment rose to a height of 24 feet and was capped by an ornamental concrete cornice, about 2½ feet across and hollowed out, which was known to children in the neighborhood as "the king's throne." The abutment descended from the cornice in two concrete steps, each 3 feet in height, and continuing from the lower of these and parallel to the avenue there was a stone wall 26 feet long, with a top slab 2½ feet in width. It had been the custom of children to walk along this slab, aided by a flight of wooden steps, to mount the 2 steps and climb onto the "throne" where they sat and played games. There was a wire fence inside of and parallel to the wooden steps which, had

it been extended a few more feet toward the street, would have prevented access from the steps to the top of the wall and therefore to the abutment although even in that event the "throne" would have been accessible from other directions.

Plaintiffs' daughter, 6 years, 8 months old, had climbed on the wall from the wooden steps and then onto the abutment with two other children and had seated herself on the "throne." In descending she lost her footing, fell to the street below, and was killed. The theory of plaintiffs was that the scroll formation of the cornice lured children into climbing to the top of the abutment and there therefore the company should have, by an adequate fence or other safeguard, prevented their doing so. The trial court entered a judgment of nonsuit and the judgment was affirmed on appeal. The court said (346 Pa. 268, 30 A. [2d] 123):

"We have not been referred by counsel to any Pennsylvania case, nor has our own research disclosed any, in which recovery was allowed against the possessor of land, even though a permissive playground, where a child was injured merely by falling or jumping from a stationary object or structure on the property. Liability to trespassing children has uniformly been limited to accidents arising from latent dangers, such as unguarded machinery, live wires, pits or open trap doors. This distinction results from one of the conditions of liability set forth in the Restatement of Torts, § 339, clause (c), that 'the children because of their youth do not * * * realize the risk involved * * *.' In the comment (p. 925) on this clause the Restatement says: 'A possessor of land is * * * under a duty to keep so much of his land as he knows to be subject to the trespasses of young children free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them. This does not require him to keep his land free from conditions which even young children are likely to observe and the full extent of the risk involved in which they are likely to realize. The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger.' * * * [Cases cited.]

"No danger is more commonly realized or risk appreciated, even by children, than that of falling; consciousness of the force of gravity results almost from animal instinct. Certainly a normal child nearly seven years of age—indeed any child old enough to be allowed at large—knows that if it steps or slips from a tree, a fence, or other elevated structure, it will fall to the ground and be hurt. It may be that some children, while realizing the danger, will disregard it out of a spirit of bravado, or because, to use the language of the Restatement, of their 'immature recklessness', but the possessor of land is not to be visited with responsibility for accidents due to this trait of children of the more venturesome type."

The Pennsylvania court cited this court's decision in Kayser v. Lindell, *supra,* and quoted from it. It likewise quoted in support of its conclusions Coon v. Kentucky & Indiana T. R. Co. *supra.*

The court in the McHugh case concluded by saying (346 Pa. 270, 30 A. [2d] 124):

"* * * if the range of liability in the so-called 'attractive nuisance' cases were to be extended to a situation such as that here presented, the law would cease to be in harmony with the practical considerations which properly govern community life."

In Callahan v. Buttrey, *supra,* plaintiff contended that whether Joe Stephen Palm, 7 years old, was an invitee, licensee, or trespasser, defendants might be found liable for his injuries under the rule set forth in Restatement, Torts, § 339. The court indicated that had Joe's fall from the roof of the building owned and operated by defendants resulted from a defect in the railing a basis for liability might well have been established. But Joe's fall was not due to the absence of a guard rail or a defective railing but rather to his own act in climbing upon the guard rail 4 feet from the edge of the roof. The court held that the danger of climbing upon this railing was obvious to a 7-year-old boy and that the possessor of land is not required to make his premises child-proof by providing all possible safeguards. The court said that defendants were required to exercise reasonable care to make the roof reasonably safe for the use of tenants, including their playing on the

roof, but held that the defendants had met this requirement and that Joe's injury did not result from his playing on the roof but from his climbing on the guard rail and that possessors of land are not liable for injuries to children who have overcome obstacles and safeguards and placed themselves in a place of danger. The court quoted from Kayser v. Lindell, *supra,* in support of its conclusions.

In Slinker v. Wallner, *supra,* an action was brought to recover for the death of Daryle Ahlstrand, age 6, who drowned when he fell into the bay at Duluth. Daryle and two other children were playing in the parking lot near a restaurant, throwing stones into the water at gulls. They discovered defendant Wallner's boat moored on the other side of a wall forming a barrier between the parking lot where they were and the dock at the rear of the restaurant. The wall was too high to climb so they gained access to the dock by climbing around the end of the wall. They accomplished this by placing one foot in a crack in the concrete on the side on which they were and swinging the other foot around to the parking-lot side of the wall. In returning to the parking lot, they gained access to the top of the wall by climbing iron steps and then jumping down to the parking-area side near the building where the wall was not so high from the ground. All had successfully negotiated this difficult crossing twice but on the third attempt Daryle, age 6, slipped, fell into the water and was drowned before help could be obtained.

This court made it clear in the Slinker case that since the abandonment of the so-called attractive nuisance doctrine we have placed liability squarely on the concept of negligence as that term is used in determining the duty of the owner or occupant of land to protect trespassing children from harm, and that since the Gimmestad case we have applied Restatement, Torts, § 339, to many cases of variable facts. After analyzing the rule applied by this court in Ewing v. George Benz & Sons, *supra*; Meagher v. Hirt, *supra*; Kayser v. Lindell, *supra*; and Twist v. Winona & St. Peter R. Co. 39 Minn. 164, 39 N. W. 402, 12 A. S. R. 626, Mr. Justice Knutson, speaking for the court, said (258 Minn. 252, 103 N. W. [2d] 383):

"Applying these principles to the facts of this case, the location in-

volved here is no more dangerous than any other part of the bay front of a port city such as Duluth. Furthermore, the locale itself was not dangerous, even to children. The waterfront was protected by a fence. It was only when children tried to climb around a concrete wall, obviously maintained to prevent access to the place where the boat was moored, that they subjected themselves to danger. The occupier of the premises can hardly be chargeable with constructive knowledge that children would attempt such a foolhardy approach to the other side of this wall. *To require the owner of premises adjacent to docking facilities at all times to either guard them by watchmen or require fences that could not be scaled by a child would be to impose an unreasonable and impossible burden upon the owners or occupiers of such property.* We think that the trial court correctly ruled that no negligence on the part of any defendant was established in this case." (Italics supplied.)

This court also distinguished the cases of Heitman v. City of Lake City, 225 Minn. 117, 30 N. W. (2d) 18, and Davies v. Land O' Lakes Racing Assn. 244 Minn. 248, 69 N. W. (2d) 642, by indicating that in those cases dangers were allowed to exist in areas or places where children were known to play.

In the instant case Steven was not injured while on playgrounds or in a place where children were known to play but in attempting to scale the trestles to catch pigeons for the presence of which the defendant railway company was not responsible, which it did not own, and which constituted a nuisance. None of the dangers encountered was concealed in any way.

In Twist v. Winona & St. Peter R. Co. *supra,* this court, speaking through Mr. Justice Mitchell, said (39 Minn. 167, 39 N. W. 404):

"* * * To the irrepressible spirit of curiosity and intermeddling of the average boy there is no limit to the objects which can be made attractive playthings. In the exercise of his youthful ingenuity, he can make a plaything out of almost anything, and then so use it as to expose himself to danger. If all this is to be charged to natural childish instincts, and the owners of property are to be required to anticipate and guard against it, the result would be that it would be un-

safe for a man to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves. * * *

*  *  *  *  *

"* * * In the present case, while the boy did not realize the extent of the danger as fully as would an adult, yet he knew that he had no right to go upon the turn-table; that his father had warned him that it was dangerous, and he himself knew that it was dangerous. Yet he goes, a conscious trespasser, and does the forbidden and dangerous act. While we are not disposed to adopt a severe rule by which to judge the conduct of childhood, yet such conduct on part of an intelligent boy of nearly 10½ years amounts to contributory negligence, and cannot be excused on the plea of childish instincts."

Although plaintiff had obtained a verdict in the Twist case the case was remanded with directions to the district court to enter judgment for defendant.

The doctrine of contributory negligence, of course, applies here as elsewhere in the law of negligence. 13B Dunnell, Dig. (3 ed.) § 6989(3). The applicable rule in this state is stated in 13B Dunnell, Dig. (3 ed.) § 7029, as follows:

"* * * But where a child has attained such an age as to be capable of exercising his judgment and discretion, he is responsible for the exercise of such a degree of care and vigilance as might reasonably be expected of one of his age and mental capacity. * * * While a child is not held to the same degree of vigilance that is required of an adult to constitute ordinary care, he is bound to exercise the degree of vigilance that an ordinarily prudent boy of his age, mental capacity, and intelligence is capable of using."

See, Warning v. Kanabec County Co-op. Oil Assn. 231 Minn. 293, 42 N. W. (2d) 881.

In Nolley v. Chicago, M. St. P. & P. R. Co. (8 Cir.) 183 F. (2d) 566, a suit was commenced against the railway company under Minnesota law for negligence. A 9-year-old boy undertook to "hop" a moving freight train in the yards of the railway company and in the incident

which occurred he lost a leg. The trial court directed a verdict for defendant at the close of all the evidence and plaintiff appealed. The minor admitted that both his grandmother and mother had warned him not to go down into the yards. The boy's teacher had also told him not to go around the tracks because it was a dangerous place. He knew that if any members of his school patrol saw him they would stop him or report him to his teacher. He had been told by an engineer on a previous occasion when he was playing in the yards to keep off the railroad property as he might get hurt. In spite of all this, he and some of his companions would crawl over or through the fence and slide down the bank to the tracks, but they generally ran for cover and out of the yards if any railroad man attempted to approach them.

The Court of Appeals indicated that there might be evidence tending to establish the conditions of clauses (a) and (b) of the Restatement rule, sufficient perhaps for those questions to go to the jury as elements of plaintiff's first theory of liability, but the court made it clear that the evidence which was intended to establish the conditions of clauses (c) and (d) was such that the court under Minnesota law was required to direct a verdict on the basis of that evidence.

The court referred to the application of clause (c) as follows (183 F. [2d] 567):

"The comment in the Restatement on § 339 makes this explanation of clause (c): 'The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger. Therefore, even though the condition is one which the possessor should realize to be such that young children are unlikely to realize the full extent of the danger of meddling with it or encountering it, the possessor is not subject to liability to a child who in fact discovers the condition and appreciates the full risk involved therein but none the less chooses to encounter it out of recklessness or bravado.'

"* * * the Minnesota Supreme Court has declared in a number of such cases that the facts of the particular situation left no room reason-

ably to contend that the injured child did not appreciate the dangers of the condition to which he had exposed himself."

The court in its treatment of clause (d) of the Restatement rule said (183 F. [2d] 569):

"The trial court held also on plaintiff's first theory of liability that, apart from whether plaintiff knew that he was doing a reckless thing, the evidence further would not support a finding that the Railroad had failed to exercise proper care to keep plaintiff and children generally out of the yards. This was in effect a declaration that the condition of clause (d) of the rule of the Restatement, that the dangers of the yards to plaintiff could effectively have been safeguarded against by the Railroad and avoided without undue inconvenience or burden, had equally not been satisfied. Plaintiff had contended that the Railroad owed the duty of building a fence along its right of way or that it should have employed sufficient guards or policemen to make certain that no children would succeed in getting into the yards.

"No ordinance or statute required the yards to be fenced, and the evidence showed beyond question that any such attempted fencing of the right of way would have interfered practicably with the furnishing of switching service to the spur tracks on the numerous industrial properties which were located adjacent to and along the course of the three-mile yards. Beyond this, it also was indisputable from the facts of the situation that no fence, other than a wholly insurmountable one, like a castle wall, would have served to keep plaintiff off the right of way, for he and his companions in no way heeded the obstruction presented by the guarding fences on the properties above the depression but crawled through or over them at will whenever they wanted to get into the railroad yards."

We think that the facts in the instant case clearly demonstrate that plaintiffs have failed to establish the necessary conditions required for the application of clauses (b) and (d) of Restatement, Torts, § 339. Clearly these conditions have not been met.

In Stimpson v. Bartex Pipe Line Co. 120 Tex. 232, 239, 36 S. W. (2d) 473, 477, involving a 6-year-old boy who had climbed an oil tank and had been injured, the court said:

"* * * It would be difficult, if not impossible, for a landowner to guard against the danger of falling incident to boys climbing on almost any kind of objects. Trees, fences, telephone and telegraph poles, houses, barns, garages, buildings in course of construction, and various other objects present to adventurous childhood the very danger which it is claimed the law imposed the duty upon appellee to guard against. Such a danger was not one peculiar to the condition or instrumentality which is claimed to have been so attractive as to entice the injured party thereon, hence there was no foundation for imposing a duty upon the owner of the oil tank to so guard the same as to prevent a child climbing thereon from falling off. The danger of falling from an object is one that cannot in the very nature of things be eliminated, as the guard erected to prevent falling would itself be susceptible to the same danger if a child climbed thereon. * * * The facts pleaded merely show a danger which was obvious and patent even to a child of tender years, as such a child in the very nature of things is thoroughly capable of appreciating the fact that if it falls from a structure of the height of the oil tank it would in all probability receive an injury."[3]

The following cases treat fencing, at least with regard to that required by the statute along a railroad right-of-way, and its effect in such circumstances. Fezler v. Willmar & Sioux Falls Ry. Co. 85 Minn. 252, 88 N. W. 746; Jeanette v. Minneapolis, St. P. & S. S. M. R. Co. 130 Minn. 513, 153 N. W. 1086.

The Fezler case involved rabbit hunting and this court in its opinion said (85 Minn. 255, 88 N. W. 747):

"* * * It does not appear that he was straying away from home, without any fixed purpose governing his actions. He was not running about here and there, as fancy dictated, but had planned a trip into

---

[3]See, Olson v. Ottertail Power Co. (8 Cir.) 65 F. (2d) 893; Sanders v. Baird, 195 Ark. 535, 112 S. W. (2d) 966; Doyle v. Pacific Elec. Ry. Co. 6 Cal. (2d) 550, 59 P. (2d) 93. But see, Bartleson v. Glen Alden Coal Co. 361 Pa. 519, 64 A. (2d) 846; Buckeye Irrigation Co. v. Askren, 45 Ariz. 566, 46 P. (2d) 1068; Hoff v. Natural Refining Products Co. 38 N. J. Super. 222, 118 A. (2d) 714.

the country for a specific purpose, and he had a certain definite route in mind both in going and returning. * * * Can it be said, then, that this boy, guiding his movements by an intelligently planned purpose, was within the class of infants contemplated? * * * If it was the boy's premeditated purpose to return to the village by the shorter and better route along the railroad track, a fence of this character would offer very little, if any, obstruction to him."

In Lopez v. Capitol Co. 141 Cal. App. (2d) 60, 68, 296 P. (2d) 63, 67, where a 7-year-old boy went through an opening in a protective fence and climbed on a scaffold and fell and hurt his arm, the facts are almost identical with the case at bar. There the court, with respect to fencing, said:

"Insofar as the comparison between the utility of the scaffold and the risk to children necessarily involved is concerned, the cost of complete fencing and the inconvenience of maintaining it is not slight but is apparently greater than the risk to children that was reasonably to be expected."[4]

Steven Hocking's purpose was not an impulsive decision to engage in some type of mischief. It constituted a carefully thought-out excursion which he chose to carry out until he fell, most likely from exhaustion. By his own testimony he admits that he was scared and that he fully realized the consequences. But he voluntarily assumed the risk of the injury. The distinction between assumption of risk and contributory negligence, one being closely akin to the other, is referred to in 13B Dunnell, Dig. (3 ed.) § 7041a(3), as follows:

"* * * that the plaintiff had knowledge of the risk, and that, having opportunity either to incur it or to avoid it, he voluntarily chose to incur it. * * *

* * * * *

"* * * In the ordinary personal injury action, where plaintiff puts himself in a position to encounter known hazards, which the ordinarily prudent person would not do, he assumes the risk of injury therefrom."

---

[4]Also see, Coughlin v. U. S. Tool Co. Inc. 52 N. J. Super. 341, 145 A. (2d) 482.

It seems to be well established in the law that liability does not attach to an owner or occupant for an injury to a trespassing child who climbs upon or jumps or falls from a nondefective and stationary structure, at least where the structure is useful and properly located. See, McHugh v. Reading Co. *supra*; Kravetz v. B. Perini & Sons (3 Cir.) 252 F. (2d) 905; 38 Am. Jur., Negligence, § 150.

The evidence corroborates the fact that not only Steven but other boys of adventurous spirit gained admittance from outside of the fence. In fact, after the plaintiff was injured his companion scaled the fence and ran for help. Ingress to the area could be had by going down the railroad tracks. There was some testimony that the fence was being improperly maintained, but the fence could hardly be built so as to be made boy-proof either by mending the holes or adding to it. The utility to the railway company of doing so and maintaining that and other conditions to guard against the entry of trespassers would not be slight as compared to the risk to young children becoming involved therein. In fact, the particular condition maintained by the defendant railway company upon its land coupled with a reasonably free use of its privileges is of a great utility to the possessor and of particular importance to the public interest, presenting as it does a particular condition not involving an unreasonable risk to trespassing children which can be obviated without serious interference with the public interest and the possessor's legitimate use of its property.

The record does not support the contention that Steven's injury was proximately caused by the breach of any duty owed to him by defendant railway company.

In Zorn v. Bellrose, 22 Ill. App. (2d) 331, 336, 160 N. E. (2d) 685, 687, the Illinois court approved Edmond v. Kimberly-Clark Co. 159 Wis. 83, 149 N. W. 760, and said:

"* * * It is also suggested that the fence was improperly constructed because boys could crawl through it, but we are inclined to agree with the Supreme Court of Wisconsin that it would take 'the inventive genius of an Edison' to construct a boy-proof fence."

If one were to call a railway trestle enclosed within a fence "Highly dangerous" as an artificial condition then—as many decisions have

indicated—every tree, fence, house or other object which children can climb would be a source of potential liability and this would create an intolerable burden on society. We agree with what was said in Garcia v. Soogian, 52 Cal. (2d) 107, 110, 338 P. (2d) 433, 435, by the Supreme Court of California, as follows:

"* * * The question of liability must be decided in the light of all the circumstances and not by arbitrarily placing cases in rigid categories on the basis of the type of condition involved * * *."

No decision of this court has allowed recovery where the injured plaintiff fell from some fixed or stationary object which could not be described as inherently dangerous or which did not conceal some latent condition or trap which a person of tender years would not be readily apprised of. Determining whether liability exists should not be limited to a single test. The tenor of our decisions makes foreseeability one of the prime requisites of liability.

Clearly, there must be causal relationship between defendant's breach of its obligations and the injury to the child. We have said that actionable negligence is failure to discharge a legal duty to the one injured, and, lacking that duty, there can be no negligence. There is no proof that defendant railway company was charged with any legal duty to continually patrol all sources of ingress to its railway property including its trestles and ore docks involved here. Plaintiffs' witnesses admitted that entrance could be had in any number of ways besides going through a fence, even by those who entered only for the purpose of catching pigeons.

The railroad trestles serve a very valuable function. It must be clear to anyone that climbing along the girders at heights which gradually increased was extremely hazardous. That boys scaled the heights onto the railroad trestles, by eluding the fences, in pursuit of pigeons, was known to the entire area and had been so known practically since the facilities were completed in 1918.

We have not seen fit to analyze all the Minnesota authorities cited on the part of the plaintiff. They are not controlling here.

Neither is the fact that this railway property is now located in a populous area of the city where schools have been built resulting in

more children being exposed to it controlling. Expected developments in the area have taken place since the railway was built and the trestles and docks erected with the approval of the municipal authorities.

For the several reasons stated we conclude that the judgments must be reversed and the court below is instructed to enter judgments for defendant.

Reversed and remanded.

MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.