**Myron ALSTON et al., Plaintiffs,**

v.

**BALTIMORE & OHIO RAILROAD COMPANY, Defendant.**

Civ. A. No. 75–184.

United States District Court, District of Columbia.

June 16, 1977.

Milton Heller, Washington, D. C., for plaintiffs.

Laidler B. Mackall, Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This personal injury action involves a 1972 accident in which the minor plaintiff, Myron Alston, then nine years of age, sustained a serious injury to his left leg while admittedly attempting to "hop" a railroad car owned and operated by defendant Baltimore & Ohio Railroad Company ("B&O"). As a result of this injury, Myron's leg was surgically amputated above the knee. Suit was brought on his behalf by his father, Preston Alston, who sought also to recover for certain expenditures which he has personally incurred in connection with Myron's injury. After a jury verdict was returned in the amount of $608,000,[1] defendant B&O moved for judgment notwithstanding the verdict or in the alternative for a new trial. Upon careful study of the matter and for the reasons fully set forth below, the Court finds that the defendant's motion for judgment notwithstanding the verdict should be granted.

### I.

The accident giving rise to this lawsuit took place on June 27, 1972, in the vicinity of 9th and Kearney Streets, N.E., Washington, D.C. On that day, Myron Alston and some of his young friends were playing on and near certain premises owned and operated by defendant B&O Railroad Company. These lands surround several sets of railroad tracks used by defendant for both freight and passenger trains; they extend north and south of Kearney Street, and west from 9th Street, for several hundred yards.

At the point at which the accident occurred, there are two sets of parallel tracks running in a long north-south curve. While Myron and his friends were playing on defendant's land adjacent to these two tracks,[2] a freight train consisting of almost one hundred cars[3] approached on the track farthest from the children and slowed to a halt.[4] Myron then walked up to the train and "hopped" onto one of its boxcars.[5] At that time, the train was stationary in such a position that both the forward and rear portions of it extended beyond either end of the sharp curve of the track and were com-

1. The jury returned a verdict for Myron Alston in the amount of $589,000 and awarded an additional $19,000 to his father. That latter amount roughly approximates the medical expenses incurred by Mr. Alston to that date on his son's behalf, including the estimated future costs of additional prosthetic equipment. *See* Defendant's Motion for Judgment Notwithstanding the Verdict or Alternatively for a New Trial at 45–46 & n.30.

2. Myron testified at trial that he and his young friends—particularly Eric Toliver and Joseph Speight—were in the habit of frequenting this area for the purpose of playing "games like tag, hot bread and butter, hide and seek [etc.]," as well as in pursuit of less tame activities. Trial Transcript ("Tr.") at 16. *See also* trial testimony of Joseph Speight, Tr. at 14, 22.

3. The train, identified as Train # 96, consisted of four engines, ninety-five cars and a caboose; it was owned and operated by defendant B&O Railroad.

4. *See* Tr. at 20, 37. It apparently was quite common for trains to make brief stops in that area.

5. Myron testified that he boarded the stopped train near its middle by grabbing hold of a ladder on the side of one of the cars; he did so, he said, with the intent of jumping from the train after it had commenced moving. *See* Tr. at 19, 21, 23.

pletely out of sight from Myron's position on the boxcar.[6] A short time later, after the train had begun to move, Myron jumped off of the side of the boxcar but failed to clear the tracks; his left leg was severely injured by the wheels of the train and required surgical amputation above the knee.

## II.

In bringing this action on Myron's behalf, his father charged defendant B&O Railroad with breaching its duty of reasonable care in connection with its maintenance and control of the lands upon which the accident occurred. He asserted that the defendant should have known that children such as his son often frequented these particular premises and that there existed a foreseeable danger that an accident such as Myron's might inevitably one day take place. Only through the defendant's negligence, he insisted, was such a tragedy allowed to occur. Specifically, he charged the defendant with negligently failing to erect all necessary fences, barricades, or warning signs sufficient to deter children such as Myron from entering onto the property in question and from exposing themselves to its foreseeable

hazards. Defendant's failure to take these precautions was particularly negligent, Mr. Alston contended, in light of the special and well-known attraction which these lands held for children such as his son.

From the outset of this litigation, B&O Railroad has taken the position that it owed no duty to Myron under the circumstances presented and thus was not negligent as a matter of law.[7] In its pretrial motion for summary judgment, it interposed the defense that Myron fully appreciated the dangerousness of his actions and supported this position with reference to certain deposition testimony in which Myron admitted to having known it was dangerous to "fool around with trains."[8] Such appreciation on Myron's part, defendant argued, operated as an absolute bar to recovery as a matter of law[9] and made the presentation of any further factual evidence at trial unnecessary.[10] Although this Court found defendant's arguments (and the deposition testimony upon which they were based) to be compelling, it felt that the better course was to afford plaintiffs the fullest possible opportunity to secure and present any countervailing evidence on this particular element of the case,[11] as well as upon the

6. *See* Tr. at 36–37.

7. *See* Answer at ¶¶ 3–6.

8. At deposition, Myron was asked about his intentions when he entered defendant's land on the day of the accident and was questioned concerning the regard which he had for trains. Defendant pointed to the following colloquy:
    Q. If you hadn't gotten on that car, you wouldn't have been hurt, would you?
    A. Right.
    Q. You say you went down there to hop a ride on the train?
    A. Yes.
    Q. You knew it was dangerous to fool around with trains?
    A. Yes.
    It is manifest that to "fool around with trains" was understood by Myron in this context to mean "hopping" a motionless train and then attempting to jump clear after it had commenced moving. *See* note 5 *supra.*

9. Defendant insisted that Myron's deposition testimony, *supra,* indicated beyond any question that he was "unable to meet the condition of Clause (c) of Section 339" of the Restatement (Second) of Torts. Defendant's Motion

for Summary Judgment at 13. *See also* note 104 *infra* and accompanying text.

10. In moving for summary judgment, defendant relied upon this testimony as a basis for two closely related theories assertedly entitling it to judgment as a matter of law: assumption of the risk and contributory negligence. *See* Defendant's Motion for Summary Judgment at 6–8; Defendant's Supplemental Memorandum at 1. Of course these particular theories do not come into play, if ever, until after the issue of defendant's alleged duty to plaintiffs is first resolved; in light of the Court's determination of that analytical threshold, *see* text accompanying notes 103 and 104 *infra,* they become irrelevant and need not be addressed.

11. This Court was quite frankly reluctant to determine on the papers that beyond any doubt Myron fully appreciated the nature and dangerousness of his tragic enterprise. The awareness of this youngster could be best assessed, the Court felt, only through first-hand observation of his testimony in a courtroom. Furthermore, it was entirely conceivable at that time that the plaintiffs might have been able to

specific charges of negligence which they had raised. It was—and remains—this Court's view that the summary judgment stage is an inappropriate juncture for the determination of issues such as those presented in this lawsuit. *See, e.g., Best v. District of Columbia,* 291 U.S. 411, 415–16, 54 S.Ct. 487, 78 L.Ed. 882 (1934); *Hankins v. Southern Foundation Corp.,* 216 F.Supp. 554, 558 (D.D.C.), *aff'd,* 117 U.S.App.D.C. 150, 326 F.2d 693 (1963). Accordingly, defendant's motion for summary judgment was denied and the plaintiffs were allowed an opportunity to develop fully at trial all issues presented—including Myron's asserted appreciation of the risk which he undertook when he "hopped" defendant's train.

### III.

■ At trial, the plaintiffs adduced much evidence in an effort to support their theory of negligence. Viewed in the light most favorable to them,[12] this evidence indicates that in 1972 the defendant knew (or had reason to know) that children often played by the tracks near the scene of his accident and that they had done so for quite some period of time.[13] Further, the evidence reflected that no warning signs were present in the immediate vicinity of 9th and Kearney Streets at the time of the accident, although there was some evidence that certain signs had been placed there by defendant previously.[14] It could also be inferred from the evidence presented[15] that Myron had never been formally warned either at home or at school that "hopping" trains was dangerous.[16] Finally, it was uncontested that the defendant had erected no fence or other barricade along the hundreds of yards of its right-of-way at 9th and Kearney Streets in any attempt to deter children such as Myron from approaching its tracks. On this latter point, the plaintiffs were permitted to present lengthy and detailed testimony concerning certain precautions which defendant *might* have undertaken (*e. g.* the erection of fences and the posting of warning signs) as part of such an attempt.[17]

present potentially favorable evidence on this point if given the opportunity to do so at trial.

12. *See, e.g., Law v. Virginia Stage Lines, Inc.,* 144 U.S.App.D.C. 115, 444 F.2d 990, 993 (1971); *Busey v. Washington,* 225 F.Supp. 416, 418 (D.D.C.1964).

13. One of defendant's former employees, Earl W. Keyser, testified at trial that he had observed children playing on defendant's property near the site of Myron's accident and had communicated this observation to his boss prior to June 27, 1972. *See* Tr. at 29. One neighborhood youth, Richard Leon Wilson, testified that he had played in that area, and had also "hopped" trains, for approximately ten years. *See* Tr. at 4, 7.

14. Myron testified on direct examination that he had never seen any signs near the scene of his accident warning him not to trespass there. *See* Tr. at 23–24. Yet one of plaintiffs' witnesses, Earl W. Keyser, testified that while a B&O Railroad employee he had been under specific instructions to post signs in that area and had done so:

We would put up signs warning the people not to trespass on the properties of the B&O Railroad. . . . It is a no trespassing sign and has great big letters on the top, reads 'warning, these properties . . . .'. Tr. at 30–31.

15. *See* note 12 *supra* and accompanying text. As has been stated by the Court of Appeals for this Circuit, a party opposing a motion for a directed verdict (or for judgment notwithstanding the verdict) is "entitled to every legitimate inference reasonably to be deduced from [the] evidence." *Muldrow v. Daly,* 117 U.S.App.D.C. 318, 329 F.2d 886, 888 (1964).

16. Myron was questioned directly on these points. He flatly denied ever having received such warnings and could not recall having seen a safety movie on this subject which defendant had shown at his school. *See* Tr. at 24.

17. Plaintiffs sought to prove negligence at trial by showing that defendant B&O Railroad could have effectively deterred Myron and others from playing near its tracks and "hopping" trains in that area. *See* Restatement (Second), of Torts, Section 339(d). They presented testimony supporting their contention that at a relatively "little" cost, B&O could have erected fencing and warning signs capable of either physically restraining or "psychologically" inhibiting any would-be trespasser. *See* Tr. at 121–33. Although it matters not in light of the Court's ruling, *see* notes 83, 103, and 104 *infra* and accompanying text, the Court feels compelled by all the evidence to observe that it seriously doubts that such measures would have been capable of restraining Myron Alston from "hopping" defendant's trains when he

For its part, defendant adduced certain evidence at trial which lent strong support to the legal defense which it had raised in its summary judgment motion.[18] On cross-examination of Myron Alston, for example, defense counsel once again elicited from him the admission that on the day of the accident he had entered defendant's premises intending to "hop a ride" on a train even though he "knew it was dangerous to fool around with trains." [19] Further, the uncontradicted testimony of two of Myron's young friends, Joseph Speight and Eric Toliver, established beyond any doubt that Myron was most familiar with the practice of "train hopping" and was indeed a veteran of many such incidents.[20] In fact, it was the testimony of Eric Toliver, who was present at the time of Myron's accident, that he and Myron had "jumped on trains" together earlier that afternoon;[21] Eric himself declined to join Myron once again in this activity later that afternoon when Myron was hurt only because he feared his sister Suzy, who had accompanied them this second time, would "tell" on him.[22] Finally, defendant presented additional evidence documenting certain safety measures which it had undertaken prior to the time of Myron's accident[23] and indicating the relative

was of a mind to do so. For example, Eric Toliver, one of Myron's young friends, testified to his skill at "getting right in either through or over" a fence such as plaintiffs suggest when he was only nine years of age. Tr. at 12–13. It defies both logic and the evidence to assume that Myron Alston would have been any different. See, *e.g., Nolley v. Chicago, M., St. P. & P. R.R.,* 183 F.2d 566, 569 (8th Cir.), *cert. denied,* 340 U.S. 913, 71 S.Ct. 284, 95 L.Ed. 660 (1950) ("no fence, other than a wholly insurmountable one, like a castle wall, would have served to keep plaintiff off the right of. way"); *Smith v. Southern Pacific Co.,* 222 Cal.App.2d 728, 35 Cal.Rptr. 575, 578 (1963); *Dugan v. Pennsylvania R.R.,* 387 Pa. 25, 127 A.2d 343, 348 (1956), *cert. denied,* 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957).

18. *See* notes 8–10 *supra* and accompanying text.

19. *See* Tr. at 35, 39. *See also* note 8 *supra.* Moreover, Myron admitted that he had announced his intentions to his companions prior to "hopping" the train; out of an apparent sense of confidence, he had said: " 'Do you want to see me hop the train' or something to that effect." Tr. at 34.

20. The direct testimony of Joseph Speight, called as one of plaintiffs' witnesses, revealed that there had been several occasions during the month preceding Myron's accident alone upon which the two boys had ventured down to the tracks to watch each other repeatedly "hop" freight trains. *See* Tr. at 13–15. Myron's own testimony supported this. *See* Tr. at 23–24.

21. On direct examination by plaintiffs' counsel, Eric Toliver testified as follows:

Q. What did you do at the railroad tracks?
A. We jumped on trains.
Q. Did you jump on trains earlier [the day of Myron's accident], before he got hurt?
A. Yes.
Q. How many times did you jump on trains that day?
A. Once.
Q. Did he jump on with you that day?
A. Yes.

Tr. at 6.

22. Eric described, again on direct examination, his second visit to the tracks with Myron that day as follows:

Q. All right, then what happened?
A. He kept jumping up and kept jumping back and forth—
Q. I can't hear you.
A. And I—that was the last time that we went back there—he kept jumping back and forth.
Q. On what?
A. On the railroad train.
Q. He kept jumping back and forth on the railroad train?
A. Yes.
Q. Why didn't you jump on the railroad train at that time?
A. Because my sister was going to tell my father.

Tr. at 7–8.

23. Defendant introduced into evidence a color sound film entitled "Robert" which vividly portrays the dangers confronted by children who trespass near railroad tracks. In the year preceding Myron's accident, defendant showed this film at numerous local schools—including Myron's school—as part of a safety program which also included a safety lecture by a B&O Railroad policeman on the specific dangers of "hopping" trains; Myron could recall no such warnings. Tr. at 24; *see* note 16 *supra. See also* note 14 *supra*; Tr. at 29–30 (testimony of one of plaintiffs' witnesses, former B&O Railroad policeman Earl W. Keyser who, on direct examination, stated that he would quite frequently apprehend trespassing children and "talk to them, take them home, talk with their

ineffectiveness of the fencing measures advocated by plaintiffs,[24] the absence of which plaintiffs insist amounts to negligence.[25]

At the close of the testimony, the Court once again considered the defendant's argument that under the circumstances presented it was not negligent as a matter of law, this time in context of a motion for a directed verdict and in light of the evidence adduced by both sides. The matter was taken under advisement and accordingly the case was submitted to the jury.[26] After a verdict was returned in favor of the plaintiffs,[27] defendant renewed its motion in the form of a motion for judgment notwithstanding the verdict or in the alternative for a new trial. After long and reflective study of this matter and upon careful review of the applicable law, the Court has come to the firm conviction that defendant's motion for a directed verdict at the close of trial should have been granted and that judgment for defendant notwithstanding the verdict should now be entered.

## IV.

■ This case involves a tragic injury which all concerned, especially the Court, readily agree should never have occurred. The important question which it unavoidably raises is whether the defendant railroad company should be held liable for injuries sustained by a nine-year-old child under circumstances such as those presented here.[28] There was a time when this issue

---

parents and see if we couldn't have a little understanding between them and the railroad and to keep them off the tracks where they didn't belong").

24. *See* note 17 *supra* (testimony of Eric Toliver, Tr. at 12–13). *See also, e.g., Hocking v. Duluth, M. & I. R. Ry.,* 263 Minn. 483, 117 N.W.2d 304, 317 (1962) (to construct a boy-proof fence at a reasonable cost would tax "the inventive genius of an Edison").

25. *See* Opposition of Plaintiffs to Motion of Defendant Baltimore & Ohio Railroad Company for Judgment Notwithstanding the Verdict and Motion for New Trial at 14–15. *See also* Restatement (Second) of Torts, Section 339, Clauses (d) and (e).

26. *See, e.g., Law v. Virginia Stage Lines, Inc.,* 144 U.S.App.D.C. 115, 444 F.2d 990, 991–92 & n.1 (1971), and cases cited therein. *See also* Rule 50(b), Fed.R.Civ.P., which expressly authorizes this procedure.

27. *See* note 1 *supra* and accompanying text.

28. On a more fundamental level, of course, this case necessarily raises the broader policy question of whether society should require a railroad company such as defendant to fence off countless miles of its right of way in order that it may conduct its business of transporting goods and passengers without fear of liability to incorrigibly adventuresome children. *See, e. g., Dugan v. Pennsylvania R.R.,* 387 Pa. 25, 127 A.2d 343, 348 (1956), *cert. denied,* 353 U.S. 946, 77 S.Ct. 825, 1. L.Ed.2d 856 (1957) ("It is, of course, obvious that if there were imposed upon the defendant the requirement of fencing the place where this accident occurred, it would likewise be subject to the duty of fencing the innumerable places along its many miles of tracks frequented by trespassing children, to prevent them from clambering over cars of a train halted in transit.").

It should be noted in this connection that neither Congress nor the District of Columbia City Council has seen fit to require defendant B&O to fence its twenty-one miles of right of way within the District. Such considerations cannot be ignored by this Court, particularly insofar as they comport with, and are reflected by, our law. *See* notes 105–07 *infra* and accompanying text. *See also Illinois State Trust Co. v. Terminal R.R. Ass'n,* 440 F.2d 497, 501 (7th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 100, 30 L.Ed.2d 96 (1971) ("The only methods of insuring that such injuries would not recur would be to fence the right-of-way at crossings where there is any likelihood of children's presence or to construct an overpass or underpass or place a guard at all such crossings. We do not believe Illinois law imposes any such requirement."); *Union Ry. v. Williams,* 187 F.2d 489, 493 (6th Cir.), *cert. denied,* 342 U.S. 839, 72 S.Ct. 65, 96 L.Ed. 634 (1951) ("It would be just as unreasonable to require appellant to erect unsurmountable fences along its right of way to keep out youthful trespassers."); *Joslin v. Southern Pacific Co.,* 189 Cal.App.2d 382, 11 Cal.Rptr. 267, 270 (1961) ("To hold that railways must install child-proof fences or to police the right of way in order to prevent children from being attracted to moving trains, would place an unreasonable if not an intolerable burden upon the possessor maintaining the condition."); *Scibelli v. Pennsylvania R.R.,* 379 Pa. 282, 289, 108 A.2d 348, 352 (1954) ("We have been referred to no case where a court has gone so far as to require a railroad company to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them.").

would have been resolved with unyielding decisiveness in favor of the owner-occupier of land, simply on the basis of the injured party's classificatory status as a trespasser under the common law.[29] Approximately a century ago, however, the law began to recognize that this harsh principle should not be applied without exception where the trespasser is a child of "tender years." In the 1873 landmark case of *Sioux City & Pacific R. Co. v. Stout,*[30] the Supreme Court first recognized the necessity of treating trespassing children differently from trespassing adults and, in the case of a six-year-old injured on a railroad turntable, held that a landowner could under some circumstances be liable to such a trespasser of "tender age."[31] After this notion evolved through a process of subtle delineation—which included, at one point, the legal fiction embodied by the attractive nuisance doctrine[32]—it was codified in the Restatement of Torts as the rule applied by the "great majority of American courts" today.[33] This standard, bottomed upon the modern consensus that landowners should take reasonable precautions to protect unwary children from foreseeable dangers on even private premises, creates a landowner's duty of reasonable care to trespassing children which arises whenever certain specific circumstances are found to exist. As such, it represents both a radical departure

**29.** Under common law, one who entered onto another's land was denominated a member of one of three broad categories: invitee, licensee, or trespasser; the landowner's potential liability for any injuries subsequently suffered was determined accordingly. *See* Green, *Landowner v. Intruder; Intruder v. Landowner. Basis for Responsibility in Tort,* 21 Mich.L.Rev. 495, 503–04 (1923). As the Court of Appeals for this Circuit once clearly stated, a trespasser under common law could recover "only for intentional, wanton, or willful injury or the maintenance of a hidden engine of destruction." *Firfer v. United States,* 93 U.S.App.D.C. 216, 208 F.2d 524, 528 (1953). *See also McGettigan v. National Bank,* 115 U.S.App.D.C. 384, 320 F.2d 703, 705, *cert. denied,* 375 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963) ("If he were a trespasser he could not hold the landowner or occupier liable for his injuries.").

**30.** 84 U.S. (17 Wall.) 657, 21 L.Ed. 745 (1873).

**31.** *Id.* at 659, 663. The Court's opinion presented the proposition as follows:

To express it affirmatively, if from the evidence given it might justly be inferred by the jury that the defendant, in the construction, location, management, or condition of its machine had omitted that care and attention to prevent the occurrence of accidents which prudent and careful men ordinarily bestow, the jury was at liberty to find for the plaintiff.

*Id.* at 661.

**32.** This development has been chronicled quite clearly:

From this beginning [*Stout*] the courts have fashioned a concept called attractive nuisance, under which the status of an intruding child is like that of an invitee rather than a trespasser. In other words the principles of negligence become relevant notwithstanding the child came upon the owner's land without permission. But there was under the earlier approach of the doctrine the requirement of an allurement as well as the tests of negligence. This ceased to be a serious obstacle to recovery, however, when courts began to abandon the fiction of an invitation by allurement and recognized—as the Restatement has—another basis for the result reached in such cases as Stout, namely, the value of the lives of children to society. *McGettigan v. National Bank,* 115 U.S.App. D.C. 384, 320 F.2d 703, 706, *cert. denied,* 375 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963). *See also Hayes v. United States,* 247 F.Supp. 180, 182 (D.D.C.1965).

Similarly, the American Law Institute, in a Comment to the Restatement (Second) of Torts, relates the following:

Applying this theory [attractive nuisance], the United States Supreme Court held, in United Zinc & Chemical Co. v. Britt, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615, 36 A.L.R. 28, 23 N.C.C.A. 264 (1922), that there was no liability to the child where he had not been attracted onto the premises by the particular condition which injured him. At one time this position had considerable acceptance, but it is now generally rejected. It is now recognized by most of the courts that the basis of the rule [Section 339] is merely the ordinary negligence basis of a duty of reasonable care not to inflict foreseeable harm on another, and that the fact that the child is a trespasser is merely one of the facts to be taken into consideration. The result is a limited obligation to the child, falling short of a duty to prevent all foreseeable harm to him, but *requiring reasonable care as to those conditions against which he may be expected to be unable to protect himself.*

Restatement (Second) of Torts, Section 339, Comment b (emphasis added).

**33.** *Id.*

from the landowner's near-absolute insulation from liability to all trespassers under early common law,[34] as well as a logical improvement upon the later requirement that the trespassing child be injured by the very hazard which presumably attracted him onto the landowner's premises.[35] The Restatement rule provides as follows:

> § 339. Artificial Conditions Highly Dangerous to Trespassing Children
>
> A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land *if*
>
> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, *and*
>
> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, *and*
>
> (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, *and*
>
> (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, *and*

> (e) the possessor *fails to exercise reasonable care* to eliminate the danger or otherwise to protect the children.

Restatement (Second) of Torts, Section 339 (emphasis added).

■ This formulation has for some time now been the rule applied by District of Columbia courts in cases involving injuries to trespassing children. *See, e.g., Hankins v. Southern Foundation Corp.,* 216 F.Supp. 554, 558–59 & n.4 (D.D.C.), *aff'd,* 117 U.S. App.D.C. 150, 326 F.2d 693 (1963). In *McGettigan v. National Bank,* 115 U.S.App. D.C. 384, 320 F.2d 703, *cert. denied,* 375 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963), the Court of Appeals for the District of Columbia Circuit applied Section 339 to find a basis for holding a landowner liable for injuries suffered by a nine-year-old boy playing with an explosive flare which his eleven-year-old brother had brought home from the defendant's deserted premises.[36] The major question posed by that case, as both the Court's initial and supplemental opinions make quite clear,[37] was whether the foreseeability requirements of Clauses (a) and (b) of Section 339 had been satisfied by the circumstances presented.[38] This question was resolved in the affirmative, the Court finding that "a general condition prevailed which put the landowner on notice" of the potential danger involved in keeping dangerous items in an unattended structure.[39] Hence, it was concluded that the landowner was to be held to the Re-

---

**34.** *See* note 29 *supra* and accompanying text.

**35.** *See* note 32 *supra.*

**36.** 320 F.2d at 704–05.

**37.** The Court's supplemental opinion addressed one of the fine points of the Restatement formulation:

> Appellees' petition for rehearing en banc, which has been denied, points out that we failed to note that the proposed change in the language of § 339 of the Restatement, Torts, had been approved by the American Law Institute. As the section now reads the language "should know" in Clauses (a) and (b), is changed to "has reason to know." With respect to this change the Institute Council stated that the decisions are unanimous to the effect that the possessor is under no duty to investigate to ascertain whether children

are trespassing, or are likely to trespass. . . . We adhere to our views as expressed in our opinion, adding that were we to apply the changed language of Section 339 of the Restatement to this case a reversal would still be required . . . . .

320 F.2d at 710 (supplemental opinion).

**38.** *See id.* at 707, 710. It must be remembered that the reasonable care duty to trespassing children created by the Restatement arises, by the *express* terms of that formulation, only *"if"* certain specified conditions (including, e. g., the foreseeability elements of Clauses (a) and (b)) are found to exist. Restatement (Second) of Torts, Section 339; *cf.* Comment on Clause (a) and Comment on Clause (b).

**39.** 320 F.2d at 708.

statement's standard of reasonable care,[40] inasmuch as the requirement of Clause (c) was found also to be readily satisfied:

> Furthermore the presence of children who could not be expected to appreciate and therefore avoid the risk created by the flare is *a factor here of utmost significance.*[41]

Twelve years later, in *Luck v. Baltimore & Ohio Railroad,* 166 U.S.App.D.C. 283, 510 F.2d 663 (1975), the Circuit Court had occasion to emphasize the significance of *McGettigan's* break with the attractive nuisance doctrine and its concomitant application of the Restatement's conditional standard of reasonable care. "Any remaining confusion concerning the landowner's duty to children," said the Court in *Luck,* "was laid to rest in *McGettigan* . . . ."[42] Accordingly, the defendant railroad was held liable to an eight-year-old girl struck by a train while rescuing her six-year-old brother as he attempted to play "superman" in the path of that train.[43] As was the case in *McGettigan,*[44] there was absolutely no question in *Luck* concerning the injured party's appreciation of the risk,[45] since under the rescue doctrine the *Luck* plaintiff assumed the status of her totally unwitting brother.[46] It is not surprising, then, that neither opinion contains any express reference to Clause (c) of Section 339,[47] although the basic principles of that formulation were applied, wherever pertinent, in both decisions.[48]

Yet there currently exists no small amount of uncertainty regarding the potential liability of a landowner to persons (including even adults) who are injured while trespassing upon his property. By unavoidable implication, this necessarily calls into question the very vitality of Restatement Section 339 as a carefully-drawn exception to the aforementioned common law trespasser rule.[49] This confusion stems from the District of Columbia Circuit's recent decision to abandon the common law classificatory scheme under which a landowner's potential tort liability is determined according to the precise status of the injured party.[50] In *Smith v. Arbaugh's Restaurant, Inc.,* 152 U.S.App.D.C. 86, 469 F.2d 97 (1972), *cert. denied,* 412 U.S. 939, 93 S.Ct. 2774, 37 L.Ed.2d 399 (1973), the Court of Appeals criticized "the awkwardness of fitting the circumstances of modern life into the rigid common law classifications of tres-

**40.** *Id.; see* Restatement (Second) of Torts, Section 339(e). *See also* Comment on Clause (e).

**41.** 320 F.2d at 708–09 (emphasis added).

**42.** 510 F.2d at 667. The Court of Appeals went on to remark:

> In *McGettigan,* this court again rejected the contention that a landowner could be held liable only where a trespassing child was injured by the hazard that attracted him onto the premises.
> *Id.*

**43.** *See id.* at 667; note 84 *infra.*

**44.** *See* note 41 *supra* and accompanying text.

**45.** *See* Restatement (Second) of Torts, Section 339(c). It should be noted that the exact language of Clause (c) speaks to whether trespassing children *"realize the risk"* which they encounter on the landowner's property. It is universally understood, though, that a child's " '[a]ppreciation' of the danger is what is required to bar recovery . . . ." Prosser, *Trespassing Children,* 47 Calif.L.Rev. 427, 462 (1959). *See also* Comment on Clause (c).

**46.** As the Court of Appeals stated, the injured plaintiff "based her case principally on the rescue doctrine, which provides that an injured rescuer may recover from the party whose negligence imperilled the rescuee without proving the breach of a separate duty owed to the rescuer." 510 F.2d at 665. In a footnote to that language, the Court made it crystal clear that the railroad's liability to the plaintiff arose from "a duty owed *derivatively"* through her brother and was thus based upon *his* circumstances. *Id.* at n.1 (emphasis in original).

**47.** *But see* note 41 *supra* and accompanying text.

**48.** *See* note 84 *infra.* In reviewing the record before it, for example, the *Luck* Court emphasized the evidence from which it could have been "reasonably inferred that appellee knew or had reason to know of the presence of small children." 510 F.2d at 667. *Compare with* Restatement (Second) of Torts, Section 339(a).

**49.** *See* notes 58 and 62 *infra* and accompanying text.

**50.** *See* note 29 *supra* and accompanying text.

passers, licensees, and invitees"[51] and held as follows:

> Rather than continue to predicate liability on the status of the entrant, we have decided to join the modern trend and to apply ordinary principles of negligence to govern a landowner's conduct: A landowner must act *as a reasonable man* in maintaining his property in a reasonably safe condition *in view of all the circumstances,* including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk.[52]

Accordingly, it was concluded by the Court that the defendant's potential liability to the plaintiff, a Health Inspector who slipped and fell on a flight of greasy metal stairs while engaged in an official inspection of defendant's restaurant,[53] was not circumscribed according to whether the plaintiff occupied the status of a "licensee" as opposed to that of a "business invitee";[54] rather, the landowner's duty was to be that of "reasonable care under all the circumstances."[55]

Yet despite the Court of Appeals' stated intention in *Arbaugh's* "to reduce current confusion in the law of the District of Columbia,"[56] the application of that decision has produced new confusion concerning a landowner's duty to persons who would under common law standards be denominated trespassers. Since *Arbaugh's* involved the question of an injured party's status within the old "licensee/invitee" dichotomy,[57] there is no question but that the Court of Appeals' opinion will with progressive simplicity obviate the future necessity of drawing what have in the past been all too often artificial—yet dispositive—distinctions within that particular classificatory scheme. But it is not completely settled whether that opinion should be read as also effecting the demise of the *trespasser* classification in this jurisdiction and, for purposes of the case at bar, the resultant substitution of an automatic duty of "reasonable care under all the circumstances"[58] for the more precise, requisite-laden formulation contained in Restatement Section 339.[59] In a recent case involving an adult trespasser which raised this very question, the Court of Appeals observed as follows:

> In *Arbaugh's Restaurant* this court was not required to decide whether the common law standard of care toward trespassers should be preserved intact, or abandoned along with the "invitee" and "licensee" classifications. Thus, some confusion today exists regarding the landowner's duty toward an adult trespasser.

---

**51.** 469 F.2d at 99.

**52.** *Id.* at 100 (footnotes omitted) (emphasis added).

**53.** The plaintiff in *Arbaugh's* had been directed by his supervisor to inspect the defendant's barbecue kitchen after a grease fire had occurred in one of defendant's barbecue pits. To reach this basement kitchen, where large quantities of spareribs were cooked, plaintiff had to descend a metal stairway consisting of approximately twenty steps. He suffered a disabling injury to his back when he slipped on these greasy stairs and fell to the floor below. *Id.* at 98.

**54.** *Id.* If the plaintiff were to have been classified as a "business invitee," the defendant would have accordingly been held to "the duty of care to keep the premises reasonably safe"; if plaintiff were classified as bare "licensee," the defendant would have merely owed him "the duty of warning him of any known but concealed dangers." *Id.*

**55.** *Id.* at 102. The Court elaborated as follows:

In our opinion, the time has come to put an end to our total reliance on these common law labels and to allow the finder of fact to focus on whether the landowner has exercised "reasonable care under all the circumstances." That standard contains the *flexibility necessary* to allow the jury to take account of the infinite variety of fact situations which affect the *foreseeability of presence and injury,* and *the balance of values which determines the allocation of the costs and risks of human injury.*

*Id.* at 105 (footnote omitted) (emphasis added).

**56.** *Id.* at 103.

**57.** *See* note 54 *supra* and accompanying text.

**58.** *See* text accompanying note 95 *infra.*

**59.** *See* note 38 *supra.*

*Hopkins v. Baker,* 553 F.2d 1339, at 1342 (D.C.Cir. 1977). Although it was ventured in a footnote to that opinion that "the rationale" of *Arbaugh's* "would seem fully applicable to the trespasser problem as well," [60] the Court flatly declined to so hold, preferring instead to allow the matter to remain "as yet unresolved in this jurisdiction." [61]

The Court of Appeals' evident hesitancy to jettison the common law trespasser rule, and therefore to bring about all that such a move would signify,[62] appears to this Court most understandable upon consideration of some of the logical concerns which are raised by such a contemplated step. A concurring opinion to the *Arbaugh's* decision, for example, expressed deep concern with the "broader sweep" of that opinion [63] —particularly as it might apply to property other than that "used as a business establishment" [64]—and the writer felt compelled to make, *inter alia,* the following observations:

I certainly see some rough common sense in the broad notion that a householder has no legal duty, as to trespassers entering without his consent, to fill up holes and otherwise tidy up his property so that it is in reasonably safe condition—though this is a broad conception subject to limited exceptions. [citing Restatement (Second) of Torts, §§ 333–339] I do not find these principles "awkward . . . in the circumstances of modern life" or contrary to "accepted values and modern experience." Perhaps my difficulty is that I have not studied these problems deeply enough. But then, they are not involved in the case at bar, and were not argued.[65]

Less than one year later, in a "social invitee" case which was held by the Court of Appeals to fall squarely within the rule of the *Arbaugh's* case,[66] a concurring opinion addressed the trespasser question more decisively:

---

**60.** 553 F.2d at 1342 n. 6.

**61.** *Id.* The *Hopkins* Court was able to evade this question through its finding that even a broad reading of the *Arbaugh's* decision would not affect the outcome of the appeal before it:
Thus, under even the most expansive reading of the opinion in *Arbaugh's Restaurant,* we find no error in the trial court's instruction on the statutory violation.
*Id.* at 1342.

**62.** Of course, as the common law trespasser rule goes, so too goes Restatement Section 339. *See* notes 58–59 *supra* and accompanying text.

**63.** *Smith v. Arbaugh's Restaurant, Inc., supra,* at 107 (1972) (Leventhal, J., concurring).

**64.** *Id.* The concurring opinion holds special significance to the case here at bar:
The use of the common law distinctions with respect to business establishments is mischievous because, in the context of a business establishment, *it is generally almost impossible to tell the trespassers from the licensees, or either from the invitees.* If a man scales the fence and uses my back yard as a shortcut, *I have little difficulty in saying he is a trespasser, on my premises without my consent.* But if he takes a shortcut through my parking lot or store, classification is beclouded. While a businessman may not prefer his premises to be used as a thoroughfare, he does value goodwill of individuals, often prospective customers. In the to-

tality, such goodwill is a business asset. Given the probable ambiguity of the status of anyone on business property, I am satisfied that the proper rule in such circumstances is one which gives the jury broad latitude to affix liability under a general standard of reasonable care in all of the circumstances of the case. *I assume it is understood that the "circumstances" of the case include the factual and legal relationships of the parties. Presumably the jury will not be awarding verdicts to burglars.*
*Id.* at 107–08 (emphasis added). There seems little doubt of the place logically occupied by Myron Alston within these sensible standards.

**65.** *Id.* at 108. Judge Leventhal also remarked:
As to residential premises, while I see a good case for a rule that places business and social visitors on the same footing, I also discern *some rough common-sense* in the notion that a social guest, broadly, takes a host as he is, expecting that the host will take as much care of his guest as he takes care of himself, and that he will point out latent defects.
*Id.* (emphasis added).

**66.** *Cooper v. Goodwin,* 155 U.S.App.D.C. 449, 478 F.2d 653 (1973). In *Cooper,* the plaintiff had suffered serious injury on a heavily-waxed stairway while visiting at the home of the defendant, his friend. *Id.* at 654. The Court found the determination of liability to be controlled by *Arbaugh's. Id.* at 656 & n.11.

. . . I agree with the majority that the sound evolution that is the hallmark of the common law has brought it at the present time to the point where the traditional distinction between licensees and invitees is properly considered the relic of a bygone age. . . .

This does not, however, mean that the requirements of judicial administration in a modern, largely urban, industrialized society necessarily extend so far *as to require a change in the liability of an occupant of land to a trespasser.* . . This was the problem that particularly prompted my separate opinion in [*Arbaugh's Restaurant*].

*Cooper v. Goodwin*, 155 U.S.App.D.C. 449, 478 F.2d 653, 657–58 (1973) (Leventhal, J., concurring) (emphasis added).[67] In that case, as in the later *Hopkins* decision,[68] the majority opinion fell tellingly short of abolishing the common law trespasser classification.[69] It was suggested by the Court, however, that a landowner's liability to a trespasser should logically turn on certain par-

ticular questions of "foreseeability,"[70] the very Restatement Section 339 ingredients upon which the outcome turned in *McGettigan*![71]

### V.

In order for this Court to rule on the pending motions, it finds itself relegated to the difficult task of determining an appropriate legal standard within the context of the above-described "unresolved" area of the law. Defendant contends, as it has during every stage of this litigation,[72] that its potential liability for Myron Alston's accident is governed by the Restatement Section 339 exception to the common law trespasser rule and that it owes a particular duty of reasonable care only if the requisites of that formulation have been met.[73] Plaintiffs, on the other hand, contend that under *Arbaugh's* and *Luck* a landowner now automatically owes a duty of reasonable care to one who trespasses upon his land and that the Restatement standards are therefore inapposite.[74] They ask that this

---

**67.** It is significant that Judge Leventhal felt compelled to write a separate opinion in *Cooper* even though the following language in the majority opinion roughly approximated the social invitee comments contained in his concurrence to *Arbaugh's* (see note 65 *supra*):

> Under this standard [that contained in *Arbaugh's*], the jury will have wide latitude to exercise *its own rough common sense* as to the degree of care which was reasonable for particular home owners or dwellers to take toward their guests.

478 F.2d at 656 (emphasis added). *Compare with* 469 F.2d at 108 (Leventhal, J., concurring). *See also* 469 F.2d at 106 ("In certain cases there may well be, as Judge Leventhal would hold, 'rough common sense' to the notion that a host should take no greater care of his social guests than of his own family." (majority opinion).

**68.** *See* note 61 *supra* and accompanying text.

**69.** *See* 478 F.2d at 656 n.13. *See also id.* at 659 (Sobeloff, J., concurring).

**70.** In its instructions concerning the application of the *Arbaugh's* standard on remand, the Court's language speaks for itself:

> It is for the jury to consider and weigh *all the circumstances* of Cooper's fall, including those which affect the foreseeability of the injury,[13] the burden of avoiding the injury, and the care which appellant as a reasonable

man could be expected to take for his own safety.

478 F.2d at 656 (emphasis in original). *Compare with* Restatement (Second) of Torts, Section 339, Clauses (d) and (e). In footnote 13, the Court theorized about the application of *Arbaugh's* to trespassers as follows:

> It would appear, although we need not decide, that the question of what degree of care should be exercised toward those traditionally labelled "trespassers" will, under the logic of this standard, depend to a large extent on *the foreseeability of their presence* and hence *the foreseeability of the injury.*

*Id.* at n.13 (emphasis added). *See also Hopkins v. Baker*, 553 F.2d 1339, at 1343 (D.C.Cir., 1977). *Compare with* Restatement (Second) of Torts, Section 339, Clauses (a) and (b).

**71.** *See* note 38 *supra* and accompanying text.

**72.** *See* notes 7–10 *supra* and accompanying text.

**73.** *See* note 38 *supra*.

**74.** Plaintiffs insist that even as regards trespassers, "the law has evolved beyond . . . [the] requirements of § 339, to the modern generally accepted law of negligence." Opposition of Plaintiffs to Motion of Defendant Baltimore & Ohio Railroad Company for Judgment Notwithstanding the Verdict and Motion for

Court not disturb the jury's verdict and insist that there exists substantial evidence upon which a jury properly could have found defendant to be negligent.[75]

■ For the Court to accept plaintiffs' position, however, would require it to take a significant and questionable legal step which the Court of Appeals for this Circuit has on two occasions declined to take, first in *Cooper*[76] and again only very recently in *Hopkins*.[77] Moreover, this Court regards as compelling the reservations expressed by Judge Leventhal[78] and is frankly no less troubled by them.[79] The Court is therefore unwilling to extend the *Arbaugh's* rationale to the trespasser situation here before it and to jettison the Restatement in the process.[80] Rather, it should follow the Restatement Section 339 criteria applied in *McGet-*

*tigan*, particularly insofar as they require that certain elemental threshold determinations be made by the Court prior to a consideration of the defendant's "reasonableness."[81] Certainly, the *Arbaugh's* decision itself does not dictate to the contrary.[82]

Nor does the later *Luck* decision compel the application of any standard other than those which were applied so explicitly in *McGettigan*. Plaintiffs point to that case as purported evidence that Restatement Section 339 has somehow been abandoned in favor of the *Arbaugh's* standard, for child-trespasser cases. Such an argument, however, not only ignores the express acknowledgement in *Luck* that the import of *Arbaugh's* does *not* extend to the trespasser category,[83] but it also overlooks the fact that *Luck* presented a situation wholly different from the case at bar.[84] This Court

New Trial at 23. At oral argument on the pending motions, plaintiffs' counsel stated his view that Section 339 had been "rejected" by the Court of Appeals in *Arbaugh's* and in *Luck*.

75. *See id.* at 12–15, 22–26, and 39–41.

76. *See* 478 F.2d at 656 n.13. *see also* note 69 *supra* and accompanying text.

77. *See* 553 F.2d at 1342 n.6. *See also* notes 60 and 61 *supra* and accompanying text.

78. *See* notes 63–65 and 67 *supra* and accompanying text.

79. For example, Judge Leventhal's warning against "awarding verdicts to burglars" (note 64 *supra*), although perhaps written somewhat in jest, raises a serious question which strikes not far from the very heart of the instant case. Is one who enters railroad property with the intent to steal a quick thrill on a moving train any less a trespasser than a burglar? What's more, it is the rare burglar who, after entering onto the premises of another, will proceed to intermeddle with any unconcealed, obviously dangerous hazards encountered there. *See* text accompanying note 96 *infra*. The majority opinion in *Arbaugh's* recognizes that, "[o]f course, the circumstances of the visitor's entry have some relation to the question of landowner's liability." 469 F.2d at 106.

80. *See* notes 58 and 62 *supra* and accompanying text.

81. *See* note 38 *supra*. *See also, e.g., Hocking v. Duluth M. & I.R. Ry.*, 263 Minn. 483, 117 N.W.2d 304, 309 (1962); *Dugan v. Pennsylvania Ry.*, 387 Pa. 25, 127 A.2d 343, 346 (1956),

*cert. denied*, 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957).

82. *See Hopkins v. Baker*, 553 F.2d 1339, 1341–1342 & n.6 (D.C.Cir. 1977); *Cooper v. Goodwin*, 155 U.S.App.D.C. 449, 478 F.2d 653, 656 & n.13 (1973).

83. Although the *Luck* opinion does cite to *Arbaugh's* for support, 510 F.2d at 667, it simultaneously acknowledges the fact that the holding of that case, *viz.* trespassers, "is in the strict sense dicta." *Id.* at 665 n.2. Moreover, the *Luck* opinion contains a second, perhaps prescient, qualification that "no view" was intimated "as to the railroad's duty had the trespasser in this case been an adult [*i.e.*, one who is presumed or found to have appreciated the risk] rather than a child." *Id.* at 667 n.5.

84. The factual circumstances presented in *Luck*, particularly as regards the all-critical element of appreciation of the risk, readily distinguish that case from the case at bar. In *Luck*, the eight-year-old plaintiff harbored no intention of risking serious injury by intermeddling with a moving train. Rather, she had been peaceably resting on the front porch of her home when she spied her six-year-old brother playing "superman" in the path of an oncoming freight train. 510 F.2d at 664. After rushing to the tracks and successfully pushing her brother to safety, she was struck by part of the train's engine before she had time to jump completely clear of the tracks herself. *Id.* Thus, by operation of the "rescue doctrine," the young *Luck* plaintiff assumed the status of her totally unwitting brother and could not be barred from recovery because of her apprecia-

simply cannot read *Luck*, as plaintiffs would suggest, as departing in any way from the Restatement standards applied in *McGettigan*.[85]

This is not to say, however, that the *Arbaugh's* standard of "reasonable care under all the circumstances" necessarily holds no significance for a child-trespasser case such as the instant one. Quite to the contrary, because inasmuch as any reasonable assessment of "all the circumstances" surrounding Myron Alston's accident would logically include, as considerations of the first order, an analysis of the appreciation and foreseeability elements of Section 339 Clauses (a) through (c),[86] it would appear that the progressive *Arbaugh's* approach comports strikingly well with the Restatement standards for child-trespasser cases.[87] In fact, this Court is of the view that the *Arbaugh's* reasonable care standard—particularly in view of its all-important "under all the circumstances" qualification—would become virtually identical to Section 339 if it were extended to the trespasser category and applied to child-trespasser situations such as this one.[88] After all, it must be

---

tion of the risk. *See* note 46 *supra* and accompanying text.

Moreover, although it was clear in *Luck* that even a slight decrease in the train's speed would have avoided the young girl's injury, "[t]here was evidence that virtually simultaneously with the accident, the train's crew was seen 'having a conversation' and 'laughing among themselves.'" 510 F.2d at 664. Hence, because of the unique circumstances of the *Luck* plaintiff, combined with the fact that the defendant railroad's employees were found "negligent in not keeping an adequate lookout" (*Id.* at 667), the Court of Appeals understandably held that the railroad had breached a duty of reasonable care in connection with plaintiff's injury. *Id.* at 664. Certainly, no portion of Restatement Section 339 remains unsatisfied by such circumstances. *Cf. id.* at 667.

85. The plaintiffs contend that this case should be governed by the *Arbaugh's* standard instead of by the Restatement and that the *Luck* opinion absolutely requires the adoption of such a view. They would have this Court read *Luck* as standing for the proposition that the *Arbaugh's* automatic duty of reasonable care has been somehow substituted for Restatement Section 339 in child-trespasser cases. *See* note 74 *supra* and accompanying text.

This the Court is unwilling to do, because it cannot discern any logical support for such a view. It seems clear, as acknowledged in the *Luck* opinion, that *McGettigan* settled the law in child-trespasser cases and that it carefully applied the provisions of Restatement Section 339. It also appears, as again acknowledged in *Luck* as well as in *Hopkins* and *Cooper*, that the subsequent *Arbaugh's* decision in no way affected this. Hence, this Court is unable to read *Luck* as in any way marking a departure from *McGettigan* and Section 339 of the Restatement. Indeed, the very fact that the *Luck* opinion extolls *McGettigan* as having "laid to rest" any "confusion" in this area of the law leaves little room for any contrary view. 510 F.2d at 667; *see* note 42 *supra* and accompanying text.

86. Not to mention an analysis of the more subjective criteria found in Clauses (d) and (e). *See, e.g., Cooper v. Goodwin, supra* at 656. *See also* notes 38 and 45 *supra* and accompanying text.

87. *See, e.g.,* note 70 *supra*.

88. In the *Arbaugh's* majority opinion, the Court spoke of the new general standard as "contain[ing] the *flexibility necessary* to allow the jury to take account of the infinite variety of fact situations which affect the *foreseeability of presence and injury,* and the balance of values which determines the allocation of the costs and risks of human injury." 469 F.2d at 105 (footnote omitted) (emphasis added). And later, in *Cooper,* this point was re-emphasized: "As we said in *Smith* [*v. Arbaugh's*] this standard cannot be set in the abstract but will vary according to the circumstances of each and every case." 478 F.2d at 656. In each of these decisions, the Court had occasion to describe with greater specificity how that standard was to be applied (*i.e.,* what is included within "all the circumstances"). In *Arbaugh's* it was explained:

A landowner must act as a reasonable man in maintaining his property in a reasonably safe condition *in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury,* and the burden of avoiding *the risk.*

*Id.* at 100 (footnote omitted) (emphasis added). *See also* note 52 *supra* and accompanying text. In *Cooper,* the standard was discussed within the specifics of that case as follows:

It is for the jury to consider and weigh *all the circumstances* of Cooper's fall, including those which affect the foreseeability of the injury, the burden of avoiding the injury, *and the care which appellant as a reasonable man could be expected to take for his own safety.* 478 F.2d at 656 (footnote omitted) (emphasis added). Again, it should be noted that the Court then elaborated further through the sug-

remembered that Section 339 is simply a specially-tailored exception to the harsh common law trespass rule [89] which by its express terms [90] triggers a duty of reasonable care to trespassing children who are within a certain foreseeable zone of risk and who "because of their youth" do not fully appreciate the dangerousness of the hazard with which they intermeddle.[91] Why would not the *Arbaugh's* standard effectively approximate Section 339 in a child-trespasser case if the common law trespasser classification were to be abolished? [92]

■ There would appear, though, to exist at least one significant distinction between the two formulations, one which is pertinent to the manner in which the defendant railroad's potential liability in this case is to be determined. As has been stated, Section 339 carves out an exception to the common law trespasser rule by causing a landowner's duty of reasonable care to arise "if" certain specified elements are present.[93] The absence of any one required element renders irrelevant an assessment of the landowner's "reasonableness" and signifies that he is not liable as a matter of law.[94] Under the *Arbaugh's* standard, on the other hand, the determination of a landowner's

liability appears to *proceed* from the premise that a duty of reasonable care is automatically owed; the trier of fact must therefore determine, upon a consideration of "all the circumstances," whether that given standard of "reasonableness" had been met.[95] The principal difficulty with applying this approach to trespasser cases, this Court feels, is that there is simply no basis under either common law or statute for requiring a landowner to meet a subjective standard of "reasonableness" toward a person who unlawfully enters onto his premises with the avowed intention of knowingly and deliberately exposing himself to an unconcealed, obviously dangerous hazard thereon.[96] As regards such a trespasser, the law has never presumed—and should not now presume—a landowner's duty unless it is first shown that certain extenuating "circumstances," considered in the context of contemporary social policy, so require.[97]

After full consideration of the evidence presented at trial, the Court can draw no other conclusion than that Myron Alston was just this sort of trespasser. It is undisputed on the record that he entered the defendant's premises with the specific intention of "hopping" a moving train, despite the fact that he knew it was danger-

---

gestion that within the context of a trespasser situation, "all the circumstances" would necessarily include important elements of "foreseeability." *Id.* at n.13. *See also* note 70 *supra; Hopkins v. Baker*, 553 F.2d 1339, 1343 (D.C.Cir. 1977).

It is the view of this Court that the "flexibility" to which the *Arbaugh's* majority opinion refers would be fully realized only when the "all the circumstances" portion of the *Arbaugh's* standard is read broadly enough to include, in child-trespasser cases, the critical elements of Section 339. Any other perspective would not only defy "rough common sense," but would violate the spirit of the *Arbaugh's* decision as well. *See, e.g.,* 469 F.2d at 106 & n.49.

**89.** *See* notes 29 and 32 *supra.*

**90.** *See* note 38 *supra.*

**91.** *See* Restatement (Second) of Torts, Section 339 and Comment b.

**92.** *See* note 88 *supra* and text accompanying note 86 *supra.*

**93.** *See* note 38 *supra.*

**94.** *See* notes 38 and 81 *supra. See also* note 29 *supra.*

**95.** *See* 469 F.2d at 100; *cf. Luck, supra* note 85, at 667.

**96.** The only exception, of course, would be the case of a child who, "because of his youth," does not fully appreciate the risk of intermeddling with the hazard. Hence the logic of Restatement Section 339 and its creation of a landowner's duty "if," *inter alia*, that circumstance exists.

**97.** *See, e.g.* Clauses (a) through (d) of Restatement Section 339. Nowhere has it been suggested in any quarter that Section 339, as distinguished from the common law liability rules which it amends, are in any way at odds with contemporary social policy or "alien to modern tort law." *Compare* 469 F.2d at 101.

ous to "fool around" with a train in such a way.[98] Moreover, this realization was not predicated upon some mere abstract understanding on Myron's part concerning such danger.[99] Quite to the contrary, Myron's knowledge of trains, and of "train hopping," was gleaned through considerable personal experience with that activity; according to his own testimony and the uncontradicted testimony of his friends, he had engaged in it repeatedly on at least several prior occasions.[100] The fact that he was only nine years of age when he unsuccessfully subjected himself to that dangerous experience is readily dwarfed into insignificance by the evidence establishing that Myron unquestionably understood and appreciated[101] that risk as fully—and perhaps even more fully—than most persons twice or several times his age.[102] A careful re-

**98.** *See* notes 8 and 19 *supra* and accompanying text.

**99.** The Restatement's conditional landowner's duty was designed to protect children of "the age of mischief," whose "childish lack of attention" and "inability to appreciate their surroundings" fails to comport with their "immature" and "reckless" curiosity. Restatement (Second) of Torts, Section 339, Comments c and i. To such children, because of what the American Law Institute calls their "imperfect realization," the notion of extreme danger is often nothing more than a mere abstraction lacking any concrete frame of reference. This would hardly seem to describe Myron Alston's relation to the danger posed by a moving train.

**100.** *See* notes 20–22 *supra* and accompanying text.

**101.** *See* note 45 *supra*. As Dean Prosser has pointed out:

Since the one basic reason for a rule distinguishing trespassing children from trespassing adults is the inability of the child to protect himself, the courts have been quite firm in their insistence that if the child is fully aware of the condition, understands and appreciates the risk which it carries, and *is quite able to avoid it*, he stands in no better position than any adult with similar knowledge and understanding.

Prosser, *Law of Torts*, § 59, at 373 (1971) (emphasis added).

**102.** Both common sense and the American Law Institute teach that "[t]here are many dangers, such a [*sic*] those of fire and water, or of falling from a height, which under ordinary conditions may reasonably be expected to be fully understood and appreciated by any child of an age to be allowed at large." Restatement Section 339, Comment j. Regarding such a danger the landowner should not be liable, nor should any duty arise in connection with a mechanism on his land which "reckless children . . . use to their harm *in a spirit of bravado or to gratify some other childish desire and with as full a perception of the risks which they are running as though they were adults*." *Id.* at Comment i (emphasis added). *See also Brown v. Baltimore & Ohio R.R.*, 162 U.S.App.D.C. 18, 495 F.2d 1074 (1974) (no liability to child who "hopped" a train "on a dare").

Moreover, of moving railroad trains in general it has reasonably been said:

Nothing could be more pregnant with warning of danger than the noise and appearance of a huge, rumbling, string of railroad cars. It cannot be compared with the silent, deadly danger of highpower electricity, the inanimate attraction of stationary machines, traps of turntables, loose boards, unseen pitfalls, or the still, inviting depths of a swimming pool to a tiny child. *Herrera v. Southern Pacific Co.*, 188 Cal.App.2d 441, 10 Cal.Rptr. 575, 580 (1961). *See also Joslin v. Southern Pacific Co.*, 189 Cal.App.2d 382, 11 Cal.Rptr. 267, 269 (1961) ("The dangers of being near a moving train, let alone attempting to board it, are so patent that we shall not burden this opinion with a discussion of them.").

The evidence in this case allows for no other conclusion than that Myron appreciated the risk of his "train hopping" activities with nothing less than a sophistication well beyond his years. It strains basic credulity to suggest, as plaintiffs' counsel would apparently have this Court accept, that Myron engaged in this conduct on a repeated basis only because he did not fully understand the risk which he was undertaking. Rather, the Court gleans from the testimony and demeanors of Myron Alston, Eric Toliver, and Joseph Speight that they did this time after time only because they found it "exciting" and did not wish to stop. Tr. at 25 (testimony of Joseph Speight). Even Myron candidly admitted on cross-examination that he knew it was dangerous merely to "try to cross railroad tracks." Tr. at 32. Both Eric and Joseph left no doubt in their testimony that they had fully appreciated the dangerousness of "train hopping" at the times that they accompanied Myron prior to June, 1972. *See* Tr. at 25; Tr. at 14 (testimony of Eric Toliver). There is absolutely nothing to suggest that Myron's regard for "train hopping" in any way differed.

Neither is Myron's insistence that he "didn't think [he] would get hurt, though" (Tr. at 37) of any necessary significance. It is well-understood that "neither knowledge of the danger involved, nor appreciation of the magnitude of the risk, requires the clair-

view of the record reveals no substantial evidence upon which a reasonable person could reach a conclusion to the contrary.[103]

Thus, since as the "circumstances" of Myron's accident unquestionably include his full appreciation of the risk, the instant case does not meet the requirement of Restatement 339(c) and therefore cannot support plaintiffs' allegation that the defendant railroad breached a duty of reasonable care by failing to prevent Myron somehow from risking both life and limb.[104] It has never been part of our law that a landowner may be liable to one who, after unlawfully entering his land, proceeds to wantonly expose himself to unmistakable danger in total disregard of a fully-understood risk, simply for the thrill of the venture.[105] Such a result is expressly proscribed by the Restatement[106] and this Court cannot imagine that it falls within the contemplation of the Court of Appeals in *Arbaugh's*, even if the doctrine of that decision were to be extended to the trespasser classification.[107]

Accordingly, defendant B&O Railroad is entitled to a judgment as a matter of law that it is not liable for Myron Alston's injuries[108] and its motion for judgment notwithstanding the verdict will be granted.

voyance to foresee the exact accident and injury which in fact occurred. The threat of injury need not be so great that it is probable." *Sperling v. Hatch*, 10 Cal.App.3d 54, 61, 88 Cal.Rptr. 704, 709 (1970). *See also Kendall v. Gore Properties, Inc.*, 98 U.S.App. D.C. 378, 236 F.2d 673, 682 (1956) (Plaintiff "need not have foreseen the precise injury, nor 'should [he] have had notice of the particular method' in which a harm would occur, if the possibility of harm was clear to the ordinarily prudent eye.").

103. *See e.g., Business Development Corp. v. United States*, 428 F.2d 451, 453 (4th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). This Court finds no substantial evidence upon which a reasonable person could find that Myron did not fully appreciate the risk of his "intermeddling." *See* note 102 *supra*.

104. *See, e.g.,* notes 38 and 45 *supra* and text accompanying note 81 *supra*.

105. *See* notes 96 and 102 *supra* and accompanying text.

106. *See, e.g.,* notes 45 and 102 *supra*.

107. This Court intimates no favor toward such a development.

108. The outcome arrived at today is supported by numerous other decisions which have addressed similar or related questions to reach the same result. *See, e.g., Illinois State Trust Co. v. Terminal R.R. Ass'n*, 440 F.2d 497 (7th Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 100, 30 L.Ed.2d 96 (1971); *Pierce v. New York Central R.R.*, 409 F.2d 1392 (6th Cir. 1969); *Illinois Central R.R. v. Kean*, 365 F.2d 785 (8th Cir. 1966); *Dugan v. Pennsylvania R.R.*, 387 Pa. 25, 127 A.2d 343 (1956), *cert. denied*, 353 U.S. 946, 77 S.Ct. 825, 1 L.Ed.2d 856 (1957); *Union Ry. v. Williams*, 187 F.2d 489 (6th Cir.), *cert. denied*, 342 U.S. 839, 72 S.Ct. 65, 96 L.Ed. 634 (1951); *Nolley v. Chicago, M., St.P. & P. R.R.*, 183 F.2d 566 (8th Cir.), *cert. denied*, 340 U.S. 913, 71 S.Ct. 284, 95 L.Ed. 660 (1950); *Pittman v. Pedro Petroleum Corp.*, 42 Cal.App.3d 859, 117 Cal.Rptr. 220 (1974); *Miles v. Receivers*, 17 Fed.Cas. 285, No. 9,544 (E.D.Va.1883); *Sperling v. Hatch*, 10 Cal.App.3d 54, 88 Cal.Rptr. 704 (1970); *Smith v. Southern Pacific Co.*, 222 Cal.App.2d 728, 35 Cal.Rptr. 575 (1963); *Joslin v. Southern Pacific Co.*, 189 Cal.App.2d 382, 11 Cal.Rptr. 267 (1961); *Herrera v. Southern Pacific Co.*, 188 Cal.App.2d 441, 10 Cal.Rptr. 575 (1961); *Gutirrez v. Southern Pacific Co.*, 174 Cal.App.2d 866, 345 P.2d 326 (1959); *Walker v. Pacific Elec. Ry.*, 66 Cal.App.2d 290, 152 P.2d 226 (1944); *Kline v. New York, N.H. & H. R.R.*, 160 Conn. 187, 276 A.2d 890 (1970); *Baltimore & Potomac R.R. v. Webster*, 6 App.D.C. 182 (1895); *Central R. & B.K.G. Co. v. Golden*, 93 Ga. 510, 21 S.E. 68 (1894); *LeBeau v. Pittsburg, C. & St.L. R.R.*, 69 Ill.App. 557 (1897); *Chicago, S.S. & S.B. R.R. v. Sagala*, 140 Ind.App. 650, 221 N.E.2d 371 (1966); *Klaus v. Southern Ry.*, 107 So.2d 305 (La.App.1958); *Weeks v. New Orleans, S.F. & L. R.R.*, 40 La.Ann. 800, 5 So. 72 (1888); *Hocking v. Duluth, M. & I.R. Ry.*, 263 Minn. 483, 117 N.W.2d 304 (1962); *Mehalek v. Minneapolis, St.P. & S.S.M. Ry.*, 105 Minn. 128, 117 N.W. 250 (1908); *Smith v. Illinois Central R.R.*, 214 Miss. 293, 58 So.2d 812 (1952); *Brooks v. Norfolk & W. Ry.*, 45 Ohio St.2d 34, 340 N.E.2d 392 (1976); *Scibelli v. Pennsylvania R.R.*, 379 Pa. 282, 108 A.2d 348 (1954); *Courtright v. Southern Compress & Warehouse Co.*, 299 S.W.2d 169 (Tex.Civ.App. 1957); *George v. Texas & N.O. R.R.*, 290 S.W.2d 264 (Tex.Civ.App.1956); *Kollentz v. Chicago & N.W. R.R.*, 170 Wis. 454, 175 N.W. 929 (1920).